## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAFFI KHATCHADOURIAN,                     )
                                          )
    Plainitff,                            )     Civil Action 16-cv-0311 (RCL/DAR)
        v.                             )
                                          )
DEFENSE INTELLIGENCE                      )
AGENCY, et al.                            )
                                          )
    Defendants.                           )
                                          )
_____  )

## DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION FOR *IN CAMERA* REVIEW, AND REPLY IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendant Defense Intelligence Agency ("DIA") files this reply in support of its Motion for Summary Judgment (ECF No. 64) and in opposition to (i) Plainitff's Motion for Summary Judgment (ECF No. 78), and (ii) Plaintiff's motion for *in camera* review (ECF No. 79).

As demonstrated by DIA's opening summary judgment brief and the Declaration of Alesia Y. Williams ("Williams Decl.") (ECF No. 64-1) and accompanying *Vaughn* index (Ex. A to Williams Decl.), as well as the Supplemental Declaration of Alesia Y. Williams attached hereto ("Supp. Williams Decl.") (Ex.1), DIA validly withheld certain information in whole or part from responsive records pursuant to Exemptions 1, 3, 5, 6, and 7.  DIA conducted an adequate search reasonably calculated to identify responsive records, and there is no evidence of bad faith in the record, as Plaintiff mistakenly suggests.  Accordingly, the court should grant summary judgment to DIA, deny Plainitff's summary judgment motion, as well as deny Plaintiff's motion for *in camera* review.

## ARGUMENT

**I.    DIA CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS**

Plaintiff challenges DIA's search for documents responsive to the first two prongs of its February 16, 2012 FOIA request (its first request), which sought (1) "documents relevant to the creation, scope, structure, and responsibilities" of the IRTF, and (2) "[a]ny conclusions, reports, or assessments (provisional and/or final) that have been generated" by the IRTF.  Compl., Ex. B (ECF No. 1-2); Williams Decl. ¶ 5.  DIA's opening brief established that DIA conducted "a search reasonably calculated to uncover all relevant documents," all that FOIA requires.  *See Weisberg v. Dep't of Justice,* 745 F.2d 1476, 1485 (D.C. Cir. 1984); Defendant's Memorandum In Support of Their Motion for Summary Judgment ("Defs.' Mem"), ECF No. 64, at 8-14. Plaintiff's various arguments in opposition are meritless, as we demonstrate below.

**A.    DIA Conducted a Reasonable Search in Response to the First Prong of the First Request**

As DIA has explained, it reasonably interpreted the first prong of Plaintiff's first FOIA request seeking "documents relevant to the creation, scope, structure, and responsibilities" of the IRTF to seek formational documents about the IRTF, such as records about the IRTF's scope, performance, deliverables, concept of operations, mission statement, mission requirements, leadership chain of command, and organization charts.  Defs.' Mem. at 12; Williams Decl. ¶ 6. This was a reasonable interpretation of Plaintiff's request, and Plaintiff does not appear to argue otherwise.  *See Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 154-55 (D.D.C. 2010) (stating that "[a]n agency may decide to limit the scope of an ambiguous request as long as the narrowed scope is a reasonable interpretation of what the request seeks").

Instead, Plaintiff contends that the search protocol used by DIA to identify emails responsive to the first prong of the first request was inadequate.  The first prong of this request

was not easily susceptible to an electronic search of email records, as it broadly sought

"documents relevant to the creation, scope, structure, and responsibilities" of the IRTF.  In an

effort to reach consensus with Plaintiff about the parameters of an email search and reduce the

contested issues in the case, DIA conducted several test searches in 2017, using key word search

terms and date ranges proposed by Plaintiff.  Plaintiff's first proposed search, using only "IRTF"

and "Information Review Task Force" as search terms, yielded over 1.8 million emails.  His

second proposed search, still using only those two broad search terms but applying a cutoff date

of June 5, 2013, resulted in 118,500 hits.  Williams Decl. ¶ 15.  Plaintiff then asked DIA to run

test searches with significantly more search terms, including certain names of DIA officials and

terms like "Assange," "Manning," and "surveil."  This test search yielded over 18,000 hits,

excluding possible attachments.  *Id*. ¶¶ 16-18.  Importantly, all three of these tests merely

identified the number of emails that were *potentially* responsive to the first prong of the first

request, as the search terms were all significantly broader than the request – i.e., documents

relevant to the creation, scope, structure, and responsibilities of the IRTF.

   When DIA reviewed for *responsiveness* two sample sets of 300 emails each from the test

search that resulted in 18,000 hits, it determined that only 2% from the first sample were

responsive and only 4% from the second sample were responsive.  *Id.* ¶¶ 19-22.  That would

mean that DIA would have to review over 18,000 emails to come up with only 360-720 emails

that were actually responsive to the first prong of the first request.  DIA began processing the

responsive records from these samples but decided to develop a more targeted, efficient search

protocol for identifying documents relevant to the creation, scope, structure, and responsibilities

of the IRTF.   *Id.* ¶ 25.

DIA's Office of the General Counsel interviewed several individuals who were involved in the creation of the IRTF and who were knowledgeable about the timeframe for standing up the IRTF, and reviewed the previously identified responsive records. *Id.* ¶ 26. Based on these interviews, DIA identified six individuals who were most significantly involved with the IRTF during the period in which it was being stood up. DIA then searched these custodians' secure system emails using search terms based upon the information gleaned from the interviews with members of the IRTF as well as a review of recurring terms in the previously identified responsive records. *Id.* ¶¶ 27-29. Those search terms were "organiz*," "scope," "TF 725" (the IRTF's early working name), "structur*," and "CONOPS" (standard terminology in the defense world for plans of operation). *Id.* DIA used a date range of July 25, 2010, to August 30, 2010, which was the period from when the IRTF was established to slightly after it was fully operational. This date range was selected based on the fact that the individuals who DIA interviewed indicated that most correspondence regarding the IRTF's organization and structure, to the extent it existed, occurred in the first few weeks after its creation. Id. ¶ 28.

As set forth in DIA's opening brief, DIA's search methodology, which relied on interviews with the people most knowledgeable about where to find responsive records, was efficient and reasonable, particularly given the nature of the request. Def.'s Mem. at 13. It was also ultimately DIA's burden to construct, execute, and defend an adequate search. *See Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (agency must demonstrate the adequacy of its search by providing a "reasonably detailed affidavit, setting forth the search terms and the type of search performed"); *Schrecker v. Dep't of Justice*, 217 F. Supp. 2d 29, 36 (D.D.C. 2002) (upholding agency's search where FBI rejected Plaintiff's proposed search methodology, stating that the "standard for searching for responsive documents is a standard of

reasonableness and here the FBI has conducted a reasonable search").  While DIA attempted to reach consensus with Plaintiff about the search to reduce its litigation risk, there is no requirement under FOIA that an agency obtain a requester's approval or buy-in of its search, and Plaintiff provides no authority in support of any such obligation.

In opposition, Plaintiff argues that DIA's search was unreasonable because DIA failed to process the approximately 118,500 emails identified as potentially responsive by Plaintiff's second proposed search.   Pl.'s MSJ at 10-12.  But agencies only process – and are only required to process – records that are *responsive* to a FOIA request.  The nonresponsive records are set aside and not processed because they are not responsive to the request.  *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 677 (D.C. Cir. 2016) ("The [FOIA] statute thus sets forth the broad outlines of a process for agencies to follow when responding to FOIA requests:  first, identify responsive records; second, identify those responsive records or portions of responsive records that are statutorily exempt from disclosure; and third, if necessary and feasible, redact exempt information from the responsive records.").  Plaintiff concedes that the 118,500 hits were merely potentially responsive, Pl.'s MSJ at 11, but cites no case requiring an agency to process all potentially responsive records.  The case he highlights, *Am. Immigration Lawyers Ass'n v. DHS*, 306 F. Supp. 3d 162, 165 (D.D.C. 2018) , confirms that "[t]he Government is obligated to review and disclose responsive records . . . unless the records fall into one of FOIA's statutory exemptions . . . ."  The fact that in that case the government did not review for responsiveness documents that a responsive document linked to has no relevance to the instant case.

Moreover, it is unclear why Plaintiff's argument that DIA should have processed the 118,500 emails would not extend to the 1.8 million records that his first proposed search, using

only "IRTF" and "Information Review Task Force" as search terms, identified as potentially responsive. While that result is obviously absurd, the search that led to 118,500 potentially responsive emails was the same, just limited by date to documents created on or before June 5, 2013. There is no reason why DIA should be required to review and process all of these potentially responsive records either, when they were only identified as a result of a series of tests the agency was running. Indeed, agencies routinely run test searches in the process of constructing their searches. The suggestion that they must save all of those searches and review and process all the hits finds no support in FOIA. The further suggestion that they must only do so when they communicate the test results to plaintiffs is equally baseless and would, if adopted by the court, deter agencies from having those communications in the first place and attempting to negotiate search terms.

Plaintiff also contends that the date range DIA used for its more targeted search was unduly narrow. Pl.'s Mem. at 14-15. Plaintiff argues that the "36-day" time period was unreasonable but ignores the agency's rationale for the July 25 – August 30, 2010 date range – that is, the fact that the individuals involved in the creation of the IRTF stated that most correspondence regarding the IRTF's organization and structure, to the extent it existed, occurred in the first few weeks after its creation. Williams Decl. ¶ 28. Indeed, this date range was more reasonable than the one Plaintiff proposed – up to June 5, 2013, which was two years *after* the IRTF submitted its final conclusion on July 29, 2011. Plaintiff's request that DIA search for formational documents about the IRTF two years after the IRTF had submitted its final report shows just how unreasonable Plaintiff's proposed searches were. Nor is Plaintiff's argument that its request contained no time limit persuasive. It is up to the agency to search for records in a time period in which they are reasonably likely to exist.

Plaintiff further seeks to undermine the adequacy of DIA's more targeted search by assuming that DIA failed to search the emails of the IRTF's senior leadership: Director Robert Carr, IRTF Chief Scott Liard, and IRTF Deputy Chief John Kirchhofer.  Pl's MSJ at 15-17.  The Supplemental Williams Declaration confirms, however, that "[t]he six secure system email repositories that DIA searched as part of its revised email search included the email repositories of Robert A. Carr, Scott Liard, and John Kirchhofer."  Supp. Williams Decl. ¶ 14.[1]

Lastly, Plaintiff argues that the results of DIA's more targeted email search, which identified 1,750 potentially responsive emails, only 5 of which were responsive, is somehow evidence of an unreasonable search.  As an initial matter, it is well established that the reasonableness of a FOIA search is judged by its methods, not its fruits.  *See Oglesby*, 920 F.2d at 67 n.13 (rejecting argument that "the search was unreasonable because the agency did not find responsive documents that appellant claims must exist," in light of the "importance" of the meeting that was the subject of the request); *SafeCard Servs., Inc. v. Secs. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (recognizing that agency affidavits describing a search "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'").  Plaintiff's argument also ignores the fact that the key IRTF personnel who were interviewed explained that due to the fast pace of events surrounding the creation and stand-up of the IRTF, most discussions relating to its structure and organization were verbal and ad hoc, suggesting that there would be very few, if any, responsive emails to the first prong of the request, which is largely consistent with the results of DIA's searches.  Williams Decl. ¶ 28 n. 4.  *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 292 F. Supp. 3d 284, 288

---

[1] DIA previously protected these names from disclosure under 10 U.S.C. § 424.  Williams Decl. ¶ 27 n.3.  While that assertion was valid, DIA has decided to discretionarily release the fact that their email accounts were searched, given the facts and circumstances of this case.

(D.D.C. 2018) (rejecting argument that search was unreasonable because it was "not credible" that "no paper trail exists of what the attorney general has represented was a careful, deliberate decision" on a high profile matter, since it was not "unheard of that an official might receive sensitive advice orally rather than in writing").

In sum, DIA reasonably interpreted the first prong of the first request, used search terms based on interviews with IRTF personnel and a review of recurring terms in previously identified responsive materials, and chose a date range for its search that was reasonably calculated to capture the formational documents sought by Plaintiff's request.  *See James Madison Project v. DOJ*, 267 F. Supp. 3d 154, 160-61 (D.D.C. 2017) (upholding agency's search which was based, in part, on interviews conducted with knowledgeable agency personnel).  This was a reasonable search and Plaintiff offers no persuasive arguments to the contrary.

## B.     DIA Conducted A Reasonable Search In Response to the Second Prong of the First Request

Plaintiff contends that DIA's search for documents responsive to the second prong of the first request, which called for "[a]ny conclusions, reports, or assessments (provisional and/or final) that have been generated" by the IRTF, was unreasonable because DIA did not specifically search for emails in response to this prong.  Pl.'s MSJ at 13.  But, as seen below, any documents responsive to this prong of the request were reasonably likely to be contained in the IRTF databases that DIA exhaustively searched.

DIA interpreted the second prong of the request to seek documents "generated as a result of the IRTF's review and analytical efforts, such as memoranda, desk notes, briefings, and interim assessments, among others, from the IRTF task force itself: not communications of individual members of the IRTF."  Williams Decl. ¶ 6.  DIA reasonably concluded that these conclusions, reports, and assessments would be contained in electronic databases specifically

designed to maintain such records.   *Id.* ¶¶ 8-9.  As a result, DIA conducted a search for

responsive documents by reviewing all records maintained in the databases used by the IRTF to

store records relating to the Task Force's activities.  William Decl. ¶ 7; *see also* Supplemental

Declaration of Alesia Y. Williams ("Supp. Williams Decl.") ¶ 18 ("Based on the understanding

that the IRTF electronic databases identified in the [the 2018 Williams Declaration] were

intended to be the repositories for all products generated by the IRTF, DIA reasonably

determined that these electronic databases were the locations most likely to contain responsive

records."), attached as Exhibit 1.  Accordingly, there was no reason to search through tens of

thousands of email communications given that DIA searched the electronic databases designed to

collect the very conclusions and assessments sought by the second prong of Plaintiff's request.

*Id.*

Nothing in the language of Plaintiff's request or the responsive materials uncovered by

DIA's searches supports Plaintiff's argument that DIA was required to conduct a search for

emails in response to the second prong of his first request.  Plaintiff's request did not seek

"communications" among the IRTF about the Task Force's assessments or conclusions, nor did

it seek documents "relating to" or "concerning" these conclusions.  In contrast, with respect to

the first prong, Plaintiff's request was much broader and sought documents "relevant" to the

"creation, scope, structure, and responsibilities" of the IRTF.  *See supra*.   In sum, DIA

reasonably concluded that an email search would, at best, locate documents duplicative of its

search of the IRTF databases.

Plaintiff challenges this conclusion by pointing to non-email records released to him that

indicate that the IRTF may have routinely sent a daily morning "Email Brief" and an afternoon

"Email Brief" about the status of its work.  Pl. MSJ at 14.  However, as DIA's Supplemental

Declaration explains, DIA produced hundreds of these morning and afternoon "Email briefs" to Plaintiff based solely on its search of the original IRTF electronic database.  Supp. Williams Decl. ¶ 13.  Far from casting doubt on DIA's searches, these documents confirm DIA's understanding that documents about the IRTF's ongoing assessments were located in the IRTF databases.

### C.   Plaintiff's Remaining Arguments Against the Adequacy of the Search Fail.

Plaintiff makes several other arguments about the adequacy of the search that do not appear to be targeted at a particular prong of the first request.  Pl.'s MSJ at 17-19.  For example, Plaintiff complains that DIA released four records in a separate FOIA lawsuit, *Leopold v. Department of Defense*, No. 15-cv-01105 D.D.C. filed July 13, 2015), that were not released in this case, which are identified as Exhibit 1-4 to a declaration submitted in the *Leopold* case.  Plaintiff ignores, however, that DIA produced Exhibit 1 to this declaration to Plaintiff here.  Supp. Williams Decl. ¶ 17. While DIA's search in this case did not capture Exhibits 2-4, that is unsurprising given that the FOIA request in *Leopold* was far broader than the request here, and sought, for instance, communications between the DIA and individual members of Congress and Congressional Committees, and the IRTF's budget to name a few of the many differences between the FOIA request at issue here and in *Leopold*.  *See id*. ¶ 16 (describing *Leopold* FOIA request).  It is unsurprising that a FOIA request for different materials would yield different results, and hardly suggests that DIA's search was unreasonable.

Plaintiff also challenges DIA's search because DIA did not search Intellipedia (a Wikipedia-like online platform used by the government that, among other things, allows users to discuss "articles"); or the "RFI Portal" that allowed various governmental components and entities to request information from the IRTF; or the records of the IRTF's Congressional liaison.

Pl.'s MSJ at 18-19.  As DIA has previously explained and as the Supplemental Williams Declaration further confirms, DIA has no reasonable basis to believe that any of these locations would include responsive documents that were not already captured by DIA's email search and the searches of the IRTF databases.  Supp. Williams Decl. ¶¶ 10, 18.  For instance, Plaintiff suggests that DIA failed to produce "Talking Points" documents that supposedly would have been uncovered had DIA searched the files of the IRTF Congressional liaison.  Pl.'s MSJ at 19.  Yet DIA's *Vaughn* index identifies 17 separate records described as "Talking Points."  Supp. Williams Decl. ¶ 20.  This again confirms the reasonableness of DIA's decision to conclude that responsive documents to Plaintiff's request would either be contained in the IRTF databases that served as repositories for the assessments and conclusions sought by Plaintiff's request, or would have been captured by DIA's email search for formational IRTF documents — a search that was crafted based on the first-hand knowledge of the very personnel involved in standing up the IRTF.  *See surpa*.

Contrary to Plaintiff's suggestions, FOIA does not require an agency to conduct burdensome searches of repositories that are not likely to contain responsive information or would likely contain duplicative information.  When responding to a FOIA request, agencies are not required to produce duplicate versions of a document.  *See, e.g., Jett v. FBI*, 139 F. Supp. 3d 352, 365 (D.D.C. 2015) ("The statute is not a discovery tool that requires agencies to produce every conceivable copy in the possession of every governmental custodian."); *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 10 (D.D.C. 2004) ("[I]t would be illogical and wasteful to require an agency to produce multiple copies of the exact same document.").  And, as noted above, the fact that an agency's search may not have identified every last responsive document does not mean that it is unreasonable.  A court must evaluate not "whether there might exist any

other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Steinberg v. Dep't of Justice,* 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg,* 745 F.2d at 1485). Consequently, an agency's "failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur v. CIA,* 355 F.3d 675, 678 (D.C. Cir. 2004) (per curiam); *see also Oglesby,* 920 F.2d at 68 (explaining that "[t]here is no requirement that an agency search every record system"); *Meeropol v. Meese,* 790 F.2d 942, 952-53 (D.C. Cir. 1986) (search is not presumed unreasonable simply because it fails to produce all relevant material); *Perry v. Block,* 684 F.2d 121, 128 (D.C. Cir. 1982) (agency need not demonstrate that all responsive documents were found and that no other relevant documents could possibly exist).

> **D.    The Supplemental Declaration Avers That DIA Searched All Locations Likely To Contain Responsive Records**

Plaintiff takes issue with the Williams Decl., ECF No. 64-1, because it does not explicitly state that "all files likely to contain responsive materials were searched in response to Plaintiff's FOIA Requests." Pl.'s MSJ at 9. The Williams Declaration makes clear that DIA searched all files likely to contain responsive information, but lest there be any doubt about this point, the Supplemental William Declaration expressly states that DIA searched all locations within its system of records that it has a reasonable basis to believe contain responsive, nonduplicative materials. Supp. Williams Decl. ¶ 10

Accordingly, for all the reasons set forth above, DIA is entitled to summary judgment with respect to the adequacy of its search.

> **II.    DEFFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO ITS WITHHOLDINGS UNDER FOIA EXEMPTIONS 1, 3, 5, 6, AND 7.**

DIA has lawfully withheld responsive information pursuant to FOIA Exemptions 1, 3, 5, 6 and 7.  Below, DIA addresses Plaintiff's contention that DIA's declaration and *Vaughn* index are facially inadequate and fail to supports its withholdings, addresses his arguments with respect to particular exemptions, and then turns to Plaintiff's baseless charge that (i) certain minor errors in DIA's productions (which are common in FOIA cases and were corrected), and (ii) the agency's quality-control process here somehow amounts to evidence of bad faith.  The Court should reject Plaintiff's argument that these meritless charges require the Court to conduct an *in camera* review of classified government records.

### A.  DIA's Declarations and *Vaughn* Index Provide Sufficient Information To Enable The Court To Assess the Validity of DIA's Withholdings.

Plaintiff contends that the Williams Declaration and DIA's *Vaughn* index are "patently insufficient to allow the Court to evaluate the lawfulness of Defendants' withholdings or Defendants' compliance with its obligation to segregate non-exempt information."  Pl.'s MSJ at 23.  Plaintiff's focus, however, is almost entirely on the Vaughn index, to the exclusion of the Williams Declaration.  These documents are designed to work in tandem, and once they are read together, it is clear that DIA has provided sufficient information to support its withholdings.  In addition, as noted, DIA is submitting a Supplemental Williams Declaration that provides additional information about the bases for DIA's exemptions.

Plaintiff discusses the Vaughn index in isolation.  For instance, Plaintiff focuses on a 504-page document identified as a "Document Log" at V-318 of the Vaughn index, and asserts that "the proffered explanation for withholding those more than 500 pages in full under Exemptions 1 and 3 consists of mere generic recitations that are repeated throughout Defendants' Vaughn index." Pl.'s MSJ at 23.  In the case of V-318, the index states that classified sources and methods were withheld regarding "the methods and processes used in assessing the impact of the

unauthorized disclosure of information resulting from leaked documents." *Vaughn* index at 327.

Information about intelligence sources and methods of an intelligence agency, including the

methods and processes used to evaluate the unauthorized WikiLeaks disclosure of U.S.

government records at issue here, is properly withheld under Exemption 1.  The entry for V-318

also explains that, pursuant to Exemption 3, information was withheld about "[c]omputer links

from a classified network," which if released "would give computer savvy entities of hostile

intent a tangible target and compromise the nation's cyber security."  Vaughn index at 327.

In focusing only on select entries in the Vaughn, Plaintiff ignores that the Williams

Declaration provides extensive additional detail about the withholdings.  To take some examples:

- The Williams declaration provides details about the "military plans" withheld under
  Exemption 1 which includes "information such as the strength and deployment of forces;
  troop movements; ship sailings; [and] the location and details of past or planned attacks,
  operations or activities."  Williams Decl. ¶ 37.  Thirty-four of these records are
  "analytic assessments that include analysis of information contained in the
  unauthorized WikiLeaks disclosures that discusses general and specific details
  relating to another government's military operations, activities, plans, capabilities,
  and strategies, including tactics, techniques, and procedures; the countries within
  which those activities have occurred or are occurring; details of military cooperation
  with U.S. and/or Coalition Forces; and detailed data (and in some cases metrics) on
  the success or failure of specific military activities"  *Id*. ¶ 39.

- DIA also withheld certain information contained in 610 records "because that
  information relates to foreign relations or foreign activities of the United States, the
  disclosure of which could reasonably be expected to cause serious or exceptionally grave

damage to national security." Williams Decl. ¶ 50.  This information includes "records regarding United States diplomatic and military activities in relation to individual foreign countries, including details on bilateral discussions and meetings, diplomatic initiatives, military initiatives, joint foreign policy and information that could identify foreign intelligence sources cooperating with the United States or Coalition Forces." Williams Decl. ¶ 52.

- The declaration further explains that DIA has withheld information "from portions of 427 records because the information is protected by the deliberative process privilege and thus properly withheld pursuant to Exemption 5. Specifically, all of the information withheld pursuant to Exemption 5 were internal government communications, analyses, and recommendations, such as memoranda, desk notes, talking points, briefing slides, daily updates, and emails, all of which were either internal DoD intra-agency communications or inter-agency communications among members of the IRTF task force."  Williams Decl. ¶ 60.

Plaintiff does not explain why this level of detail is inadequate, especially given the deference that DIA is entitled to with respect to its determination that the disclosure of information would impact national security, and the nature of Plaintiff's FOIA request which, by definition, implicates classified information.  While courts review *de novo* an agency's withholding of information pursuant to a FOIA request, "*de novo* review in FOIA cases is not everywhere alike . . . ." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).  Indeed, the courts have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003); *see Ray v. Turner*,

587 F.2d 1187, 1194 (D.C. Cir. 1978) ("[T]he executive ha[s] unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record.").

"[A]ccordingly, the government's 'arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context.'" *Unrow Human Rights Impact Litig. Clinic v. U.S. Dep't of State*, 134 F. Supp. 3d 263, 272 (D.D.C. 2015) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011)).

For these reasons, the courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see Larson v.U.S. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citation omitted) ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); a*ccord Unrow*, 134 F. Supp. 3d at 272.  Consequently, a reviewing court must afford "substantial weight" to agency declarations "in the national security context." *King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987); *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure . . . ."); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security).

Plaintiff also mistakenly contend that the agency's declaration and index are facially inadequate, including with respect to V-318, because DIA allegedly did not conduct "any individualized segregability analysis with respect to *any* record."  Pl.'s MSJ at 27 (emphasis in

original).  That is incorrect.  The Williams Declaration expressly states that "subject matter experts carefully reviewed the information set forth in in the records identified in DIA's Vaughn index line by-line to determine whether DIA could make any discretionary disclosures by segregating and releasing non-exempt information."  Williams Decl. ¶ 63.  According to Ms. Williams, "[b]ased on the recommendations of the subject matter experts, I have determined that all reasonably segregable non-exempt information has been released to the plaintiff and that no additional information may be segregated in any meaningful way."  *Id*.  In short, DIA explained that it conducted a segregability analysis for every line of every document at issue in the case, and in fact produced numerous redacted documents, showing that it conducted a segregability analysis.  No more was required.  *See Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776-77 (D.C. Cir. 2002) (holding that agency had demonstrated there was no reasonably segregable non-deliberative material when it had submitted an affidavit by an agency official confirming that "a line-by-line review of each document withheld in full [had] determined that 'no documents contained releasable information which could be reasonably segregated from the nonreleasable portions.'").

Plaintiff further challenges the adequacy of DIA's *Vaughn* index because DIA did not provide specific document titles in some limited instances.  *See, e.g*., Pl.'s MSJ at 23, 25 (complaining that V-318 is identified as "document log"; V-315 is described as "IRTF Report").  But as DIA's Supplemental Declaration explains, given the sensitive nature of the materials at issue, DIA was often unable to provide highly specific titles about the records at issue because doing so would reveal information that is exempt under the FOIA.  Supp. Williams Decl. ¶ 7 (explaining that in "some situations DIA is unable to disclose the title of a responsive record because it is protected under an appropriate FOIA exemption.  For example, in some cases, the

title might be protected under Exemption 1 because it contains properly classified information that identifies sources and methods.  In other cases, DIA may need to protect the title of a record under Exemption 3, 10 U.S.C. § 424, because releasing the title would inappropriately disclose information about the specific function of the IRTF and the types of records it reviewed.").

Plaintiff also argues that entries in DIA's *Vaughn* index with respect to the materials withheld under Exemption 5 are facially deficient because some of the Exemption 5 entries do not include the sender or recipient of the document, "making it impossible to determine if it meets Exemption 5's threshold requirement of being an inter- or intra-agency communication." Pl.'s MSJ at 25.  Plaintiff, however, ignores the express statement in the Williams Declaration that Exemption 5 was only applied to "internal DoD intra-agency communications or inter-agency communications amongmembers of the IRTF task force."  Williams Decl. ¶ 60. Furthermore, elsewhere in Plaintiff's brief, he states that he is not challenging DIA's decision to withhold "names" and "secure system email addresses, and other contact information of DIA personnel" pursuant to Exemption 3, with the exception of senior IRTF leadership.  *See infra*. So, on the one hand, Plaintiff complains that DIA has not identified the names of senders and recipients of documents — even though this information is irrelevant given DIA's representation that all Exemption 5 information was contained in intra- or inter-agency records — and, on the other hand, he acknowledges that Exemption 3 protects such information from disclosure.

> **B.     Plaintiff Baselessly Suggests That There Is A Material Dispute About Whether The Exemption 1 Records At Issue Here Are, In Fact, Classified.**

In addition to his challenge to the adequacy of DIA's *Vaughn*, Plaintiff also challenges DIA's Exemption 1 withholdings by making the strained argument that there is a factual dispute about whether DIA has actually determined that the records at issue here are classified.  Pl's MSJ

at 33-34.  While it is true that a DIA FOIA analyst, during a quality control process, stated his

opinion that a few documents withheld under Exemption 1 and 3 by a particular component of

DIA contained some unclassified information, *see infra*, Part III.A, all of the records containing

information withheld pursuant to Exemption 1 and 3 were subsequently processed.  *See*

Defendants' Amended Objections and Responses to Plaintiff's First Set of Interrogatories at 6

(Exhibit 2) (stating that "DIA believes that all records referenced in the November 5, 2012 email

were reviewed in response to Plaintiff's administrative appeal, dated November 12, 2013, since

DIA conduct a review of all records in the IRTF database at that time and identified 450

responsive records that were subsequently reviewed and processed by the FOIA Office").

Furthermore, there is no dispute that Ms. Williams has expressly stated in her declaration that all

of the information withheld under Exemption 1 has been classified because the release of the

information could reasonably be expected to cause serious or grave harm to the national security.

Williams Decl. ¶ 36.   In light of this clear determination in the Williams Declaration, there is no

dispute about the fact that the agency has determined that the withheld information is, in fact,

classified.

The opinion of the FOIA analyst that some information marked classified was in fact

unclassified amounts to nothing more than internal agency debate about a preliminary

classification decision, which is irrelevant to the question of whether the agency's ultimate

classification decision is correct.  *See Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 80-81 (D.C.

Cir. 1987) (holding that fact that some ambassadors marked their responses to a questionnaire

"unclassified" did not create a material issue of fact as to validity of agency's later decision to

classify the responses);  *Evans v. Central Intelligence Agency*, 2014 WL 4357470, 11-cv-02544,

at *2-3 (D. Colo., July 9, 2014) (Ex. 1 to DIA's Opposition, ECF No. 54-1) (denying the

plaintiff's motion for discovery into the CIA's supposed change in position as to whether the photographs of Osama Bin Laden's deceased body were classified; "[t]he fact that [CIA] Director Panetta expressed a view different from the CIA's ultimate classification of the photographs indicates only that there may have been internal debate about the issue within the agency.  But the opinion simply has no bearing on whether the CIA's classification and refusal to furnish photographs to Mr. Evans was justified."); *Evans v. Central Intelligence Agency*, 2014 WL 4357470, 11-cv-02544, at *2-3 (D. Colo., Sept. 2, 2014) (finding that Mr. Panetta's statement "is entirely irrelevant to the question of whether the CIA's subsequent invocation of Exemption 1 to deny Mr. Evans' FOIA request was proper").  *See also Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152-53 (D.C. Cir. 1991) (Ginsburg, R.B., J.) (under FOIA, court evaluates agency's decision to withhold information at the time it was made).  In contrast to this authority, Plaintiff relies on a 45-year-old *per curiam* opinion in which the D.C. Circuit held that an agency failed to provide facts demonstrating whether documents had been properly classified as "confidential."  Pl's MSJ at 33-34 (citing *Schaffer v. Kissinger*, 505 F.2d 389, 390–91 (D.C. Cir. 1974)).  Here, consistent with well-established procedures, the agency provided a sworn declaration and index attesting to the fact that identified information is in fact classified and why. *Schaffer* did not involve any preliminary classification determinations and their effect on an ultimate classification decision supported by an agency declaration.  It is inapposite, and the Court should reject Plaintiff's argument that the FOIA analyst's opinions are relevant to the question of whether DIA has properly withheld information under Exemption 1.

## C.    Plaintiff's Challenges To DIA's Exemption 3 Withholdings Are Unavailing.

DIA withheld information pursuant to FOIA Exemption 3, which protects from disclosure information that is protected by a separate statute, provided that statute "requires that

the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3); *Ass'n of Retired R.R. Workers,* 830 F.2d at 336 (stating that "purpose of Exemption 3 [is] to assure that Congress, not the agency, makes the basic nondisclosure decision").  Plaintiff acknowledges that 10 U.S.C. § 424 and 50 U.S.C. § 3024(i) (the two statutes relied on by DIA here) are Exemption 3 withholding statutes that entitled DIA to withhold certain information pursuant to Exemption 3.  Pl.'s MSJ at 35.

The Supplemental Williams Declaration clarifies that DIA has properly withheld information related "to sensitive functions of DIA that fall within the meaning" of 10 U.S.C § 424.  Williams Decl. ¶ 31.  Plaintiff complains that Defendant has interpreted 10 U.S.C. § 424 too broadly by applying it to "functions" of the DIA.  Pl.'s MSJ at 35-37.  But the statute is very broad and on its face exempts from disclosure "the organization or any function of" the DIA, 10 U.S.C. § 424(a)(1), as well as information about its employees, 10 U.S.C. § 424 (a)(2).  Plaintiff wishes to read subsection (a)(1) out of the statute but, in fact, FOIA does not require disclosure of the functions of the DIA.  *Cf.   Hamdan v. Dep't of Justice*, 797 F.3d 759, 776 (9th Cir. 2015) (explaining that DIA human resources policies would likely be exempt but inappropriate emails would not be); *see also Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 932 (D.C. Cir. 2012) (interpreting similar language in a statute exempting the "functions" of the NSA).

Plaintiff also challenges certain instances in which DIA has withheld information pursuant to 50 U.S.C. § 3024(i).  Plaintiff argues that "Defendants' Vaughn index and records produced to Plaintiff, however, show that Defendants are improperly relying on this statute to protect non-secret information that does not pertain to intelligence sources or methods."  Pl.'s MSJ at 37.  Plaintiff's reference to "non-secret" information is unclear.  But to the extent he

claims that this statute may only protect classified information, he is mistaken.   While certain

information may be unclassified in a general context, sharing or disclosing that information in

the intelligence context and in connection with the IRTF may shed light on what information was

of intelligence interest to the IRTF for purposes of its damage analysis (i.e., sources) and how the

IRTF was conducting its analysis and assessments (i.e., methods).   Such information falls

squarely within the protection of 50 U.S.C. § 3024(i), in addition to 10 U.S.C. § 424.

### D.    DIA Has Properly Withheld Certain Information Pursuant to Exemption 5

As explained in DIA's opening brief, DIA properly withheld predecisional, deliberative

information from certain records pursuant to FOIA's Exemption 5.  These were primarily

communications, analyses, and recommendations (many in draft form) that preceded the IRTF's

final report assessing the impact of the unauthorized WikiLeaks disclosure, and included the

IRTF's interim analyses and assessments of harm.  Def.'s MSJ at 27-29.  Plaintiff claims in

opposition that DIA did not establish that the records are inter- or intra-agency, as Exemption 5

requires, but, as noted above, Plaintiff ignores the express statement in the Williams Declaration

that Exemption 5 was only applied to "internal DoD intra-agency communications or inter-

agency communications among members of the IRTF task force."  Williams Decl. ¶ 60.

Here, the *Vaughn* index, in conjunction with the Williams Declaration and Supplemental

Williams Declaration, provides the requisite level of detail to allow the Court to conclude that all

the elements of the deliberative process are satisfied because the withheld information is

contained in (1) intra- or inter-agency records, and (2) constitutes predecisional discussions,

including drafts.  Again, as noted above, it is hardly surprising that predecisional consultations

prior to finalizing the IRTF's final report, which occurred in July 2011, would be properly

protected by the deliberative process privilege.

Plaintiff references documents V-539, V-763, and V-778 as supposed examples of non-deliberative, predecisional records withheld under Exemption 5. However, the *Vaugh* index shows that documents V-539 and V-763 are dated September 24, 2010 and September 20, 2010, respectively; well before the release of the IRTF's final report. Although document V-778 is undated, the *Vaughn* index clearly reflects that it is an "interim" product. As noted in the Williams Declaration, information in the records for which DIA withheld information under the deliberative process privilege is "predecisional" because it was "created prior to the final report and prior to any decision or decisions on actions to remedy damage resulting from the unauthorized disclosures based on the IRTF's assessments." Williams Decl. ¶ 60.

### E.   Additional Information Provided By The FBI Establishes That DIA Properly Withheld Certain Information Pursuant to Exemption 7.

DIA withheld certain information, at the request of FBI, under Exemption 7(A) and 7(C). *See* Supplemental Williams Decl. ¶ 32. Exemption 7 permits agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information" is connected to one of several enumerated harms. 5 U.S.C. § 552(b)(7). Exemption 7(A) concerns information that "could reasonably be expected to interfere with enforcement proceedings," and Exemption 7(C) concerns information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" *Id*.

Plaintiff correctly notes that DIA initially failed to explain the basis for the Exemption 7 withholdings here, but DIA now corrects that omission in the Supplemental Williams Declaration, which provides sufficient details as to why certain information in the responsive records was withheld pursuant to Exemption 7. Supplemental Williams Decl. ¶¶ 33-38.

After further review, the FBI has indicated that the information previously protected under exemption 7(A) can be released. DIA will reprocess the affected records accordingly.

Supplemental Williams Decl. ¶ 32.  The FBI withheld information pursuant to Exemption 7(C) to protect the identity of an FBI Special Agent ("SA") conducting law enforcement investigations.  Supplemental Williams Decl. ¶ 37.  As elaborated in the Supplemental Williams Declaration, "the FBI protected the name of an FBI SA who is responsible for conducting, supervising, and/or maintaining FBI investigative activities concerning the unauthorized disclosure of classified information published on the WikiLeaks website.  This SA has responsibilities beyond this investigation, and disclosure of his/her name could lead to interruption of her/his official duties with respect to this and other national security investigations. Assignments of SAs to any particular investigation are not necessarily by choice.  Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations."  *Id*.  The Williams Supplemental Declaration also explains that "[t]he publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent, and could lead to disruptive inquiries into a pending investigation."  *Id*.  Conversely, there is no public interest in disclosure of the FBI SA's name, as it does not speak to the operations and activities of the FBI.  *Id*.  For these reasons, the FBI SA's name is properly withheld under Exemption 7(C).

## III.   PLAINTIFF'S ACCUSATION THAT THERE IS EVIDENCE OF BAD FAITH IN THE RECORD WARRANTING *IN CAMERA* REVIEW IS BASELESS.

Plaintiff contends that the agency's routine quality control process and certain unintentional, administrative errors made by DIA (common in a FOIA case and which have been corrected here), amounts to evidence of bad faith entitling him to have this Court review numerous highly classified documents *in camera*.  Mem. of Points and Authorities in Support of Plaintiff's Motion for *In Camera* Review.  ECF No. 79-1.  Plaintiff's allegations are baseless.

Moreover, to the extent that the Court finds any deficiencies in DIA's Vaughn index and declaration, the remedy is to require the agency to supplement those submissions, not for the Court to itself attempt to ascertain the classified nature of the documents through *in camera* review.

### A.   DIA's Quality Control Process Was Laudable, Not Evidence of Bad Faith

As discussed above, the Court should reject Plaintiff's argument that there is a factual dispute about whether DIA has actually determined that the records at issue here are classified. Plaintiff also claims that the predicate for that argument -- internal correspondence DIA released pursuant to Plaintiff's second FOIA request about the processing of his February 2012 request – is evidence of an effort to improperly withhold information under Exemptions 1 and 3.  Pl's MSJ at 29-30.  Plaintiff claims that this internal correspondence shows that the "DX" office within DIA initially withheld documents in full under Exemptions 1 and 3 that a subsequent review by a DIA FOIA employee suggested the records contained some unclassified information. Specifically, in November 5, 2012, Tony Kenon, who works in DIA's FOIA office, sent an email stating that, with respect to the 427 documents denied in full by DX under Exemptions 1 and 3, he had reviewed a "few of the denied in full documents" and noted that they contained unclassified paragraphs.  Pl.'s MSJ at 27 (citing exhibit to Townsend Decl.).   The notes or emails themselves do not identify the documents, nor do they provide a way for DIA to identify them.

Plaintiff also cites to a May 28, 2013 email from DX stating that it had "re-reviewed the FOIA requests, the IRTF archive and our initial response to the request and have identified no additional information for release."  Pl.'s MSJ at 29 (citing exhibit to Townsend Decl.).  Plaintiff rushes to the conclusion that this must mean that DIA ignored Mr. Kenon's concerns.

Importantly, however, it is uncontested that all of the documents containing Exemption 1 and 3 material were subsequently reevaluated and reprocessed after the analyst noted his concerns. *See* Defendants' Response to Plaintiff's First Set of Interrogatories, Exhibit 2. The fact that the FOIA analyst raised these concerns and that the agency responded to them were part of the agency's normal quality control process — a process that is laudable, not one that suggests bad faith.

Here, the question before the Court is simply whether the two declarations from Ms. Williams along with DIA's *Vaughn* index provide sufficient information for the Court to conclude that DIA properly withheld the Exemption 1 and 3 information. Predecisional consultations between Mr. Kenon and the DX back in 2012, *approximately seven years ago*, have no bearing on this question whether the classification determinations made in Ms. Williams's August 2018 declaration are valid. See *Larson*, 565 F.3d at 865 (D.C. Circuit "reaffirm[ing] our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); *Fitzgibbon*, 911 F.2d at 766 (D.C. Circuit holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure . . . ."); *Frugone*, 169 F.3d at 775 (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security).

### B.    Routine Errors in DIA's Production Are Also Not Evidence of Bad Faith and Do Not Justify *In Camera* Review of Documents

Plaintiff points to certain errors in DIA's production and suggests they demonstrate bad faith. The Supplemental Williams Declaration addresses each of these points, making clear that

these errors were simply administrative mistakes and corrected once DIA learned of them.

Plaintiff, for instance, notes that DIA's *Vaughn* index did not include a description of six documents withheld in this case.  Pl's MSJ at 32.  This was an oversight and the basis for withholding these documents is now addressed in detail in the Supplemental Williams Declaration.  Supp. Williams Decl. ¶ 29.  Plaintiff also notes that DIA incorrectly identified 53 records in its original *Vaughn* index as being withheld in part, but which DIA later clarified were, in fact, withheld in full.  Supplemental Williams Decl. ¶ 23.  Plaintiff argues that DIA has not supplemented its *Vaughn* index, but the agency's original index  (ECF No. 64-1) explains the basis for withholding the documents in full.

Plaintiff also suggests bad faith based on inconsistent application of redactions to an August 15, 2010 slidedeck.   Pl's MSJ at 29-30.  This slidedeck was initially reviewed by a subject matter expert in 2013, at the time of initial release.  Supp. Williams Decl. ¶ 9.  Three years later, another subject matter expert reviewed it in conjunction with the continued processing of responsive records without noticing that it had been previously processed and released to the plaintiff three years earlier.  *Id.*  The subsequent review resulted in a different application of the FOIA exemptions.  *Id.*  Such inadvertent inconsistencies are an unavoidable consequence when dealing with a large number of records and multiple reviewers over an extended period.  *Id.*  DIA has made every effort, in good faith, to ensure accurate and consistent release of information to the plaintiff.  *Id.*

Plaintiff also mistakenly contends that DIA made three productions of an identical slidedeck, dated November 29, 2010, and suggests that DIA withheld more information with each subsequent release.  Pl's MSJ at 30-31.  These records are identified as Exhibits 37-39 to the Townsend Declaration.  Supp. Williams Decl. ¶ 25.  First, a simple comparison of the

exhibits demonstrates that the document attached as Exhibit 39 is different from the documents attached as Exhibits 37 and 38. *Id*. The document at Exhibit 39 is only 20 pages, counting pages that DIA withheld in full, while the other documents are 29 pages. *Id*. Additionally, in the document attached as Exhibit 39, the slide titled "Media Analysis" begins at page 7 of the slidedeck, while in the documents attached as Exhibits 37 and 38, it begins at page 12 of the slide decks. *Id*. As regards documents 37 and 38, the inconsistent application of redactions was attributable to human error. *Id*. Inevitably, there is an element of subjectivity in how exemptions are applied and, consequently, different reviewers may process records with different results. This case ultimately resulted in 850 responsive records. As previously attested to, DIA has made every effort to ensure that records were processed consistently and in conformity with the FOIA and its exemptions. This is reflected in DIA's pre-release quality check processes, and DIA's supplemental releases.

Plaintiff also asserts that DIA withheld portions of a record in this case that was produced in the *Leopold* case. In response to this assertion, DIA has confirmed that it produced the identical document in this case and the *Leopold* case. Supp. Williams Decl. ¶ 26. Page 11 of the document was inadvertently omitted from the version provided to Plaintiff, but this was again a minor administrative mistake and DIA will provide the missing page to Plaintiff. *Id*.

In sum, routine administrative mistakes, which are quickly corrected, and a routine quality control that took place back in 2012, as well as DIA's laudable effort to meet-and-confer to find a mutually acceptable email search protocol with Plaintiff —which the agency was not even required to do — do not amount to evidence of bad faith. Instead, they show an agency grappling with limited resources, seeking to cooperate with a FOIA requestor, and acknowledging and correct mistakes when they are inevitably, although regrettably, made.

There is not a shred of evidence that these were intentional withholdings of information from Plaintiff, rather than administrative errors made in the course of processing large numbers of records over an extended period of time.

## IV. Plaintiff's Motion for *In Camera* Review Is Unnecesary and Unwarranted And, Accordingly, Should Be Denied.

In light of the showing above, the court should decline Plaintiff's request that the Court conduct an *in camera* review. *See* Pl's Motion for *In Camera* Review (ECF No.79).  "If the affidavits" produced by the agency "provide[s] specific information sufficient to place the documents [at issue] within the [relevant] exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Hayden v. NSA/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979).  Here, DIA's declarations and Vaughn index provide sufficiently detailed information to show that the records at issue fall within the claimed exemptions, which is neither contradicted in the record nor has Plaintiff demonstrated any bad faith on the part of the agency.  *See supra*, Part III.  Accordingly, "*in camera* review is neither necessary nor appropriate." *Id.*

## CONCLUSION

For the reasons set forth above, the court should grant DIA's motion for summary judgment, deny Plaintiff's motion for summary judgment and deny Plaintiff's motion for *in camera* review.

Dated: May 24, 2019                                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

_/s/ Nicholas Cartier_
NICHOLAS CARTIER
(D.C. Bar # 495850)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 616-8351
E-mail: nicholas.cartier@usdoj.gov
*Attorneys for the Defendants*