# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAFFI KHATCHADOURIAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                     ) | Case No. 16-cv-0311 (RCL) |
| ) | |
| DEFENSE INTELLIGENCE AGENCY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## SUPPLEMENTAL DECLARATION OF ALESIA Y. WILLIAMS

I, Alesia Williams, do hereby declare the following to be true and correct:

1.  I am the Program Manager for the Defense Intelligence Agency (DIA),

Department of Defense (DoD) Declassification Technology Project. Prior to that, I served as the

Chief of the Freedom of Information Act (FOIA) and Declassification Services Office for DIA

from June 2014 to August 2018. I previously served as the Chief, FOIA Services Section (an

element within the DIA FOIA Office), from January 2008 to June 2014. Prior to that I was an

administrative officer processing FOIA requests at DIA from November 2006 to December

2007, and I was a contractor assigned to DIA as a FOIA Senior Document Reviewer from

January to November 2006. Prior to coming to DIA, throughout my career in the United States

Air Force ("USAF"), one of my duties was to process FOIA requests. I also spent over five

years supervising two USAF FOIA offices.

2.  As Chief of the FOIA Office, I was designated by the DIA Director as a

declassification authority pursuant to Executive Order 13526 § 3.1. I still maintain this

designation. This authority extends to all information that is classified by, originated by, or that

is otherwise under the declassification purview of DIA. I was also designated by the Director as the Initial Denial Authority for responses to FOIA requests. My administrative duties included the management of day-to-day operations of DIA's FOIA program. The FOIA Office receives, processes, and responds to requests for DIA records under the FOIA and the Privacy Act. At my direction, DIA personnel were tasked to search Agency records systems under their control to identify records and other information which may be responsive to individual requests. They forwarded any potentially responsive records that are located to my office, which in turn determines whether responsive records should be withheld in whole or in part under any applicable statutory FOIA or Privacy Act exemptions. The activities of the staff are governed by the "DOD Freedom of Information Act Program Regulation," found at 32 C.F.R. Part 286, as supplemented by the "Defense Intelligence Agency (DIA) Freedom of Information Act" regulation, found at 32 C.F.R. Part 292.

3.      In the course of my official duties at DIA as the Chief of the FOIA and Declassification Services Office, I became personally familiar with the FOIA requests submitted by Raffi Khatchadourian ("Khatchadourian"). The statements made herein are based upon my personal knowledge, upon information made available to me in my official capacity, and upon determinations made by me in accordance therewith.

4.      On August 31, 2018, I executed a declaration in support of Defendants' Motion for Summary Judgment in the above-captioned action ("2018 Declaration"). I submit this supplemental declaration in support of that Motion and to address certain assertions made in the Plaintiff's Motion for *In Camera* Review and Plaintiff's Motion for Summary Judgment and/or Partial Summary Judgment and In Opposition to Defendants' Motion for Summary Judgment.

## Motion for *In Camera* Review

5.       On pages 4-5 of the Motion, Khatchadourian asserts that DIA provided

insufficient descriptions in its *Vaughn* index. DIA's *Vaughn* index, when read in conjunction

with the 2018 Declaration, provides the requisite level of detail. Using Khatchadourian's

example regarding DIA's assertion of the deliberative process privilege, in its *Vaughn* index,

DIA identified the title of each record (where it could do so); the date of each record (where

available); and the nature of the each record (e.g., email (V-606), slide (V-607), word document:

notes (V-652), background notes (V-654), word document: draft assessment of specific data sets

(V-688), memorandum (V-692), and report (V-763)). The 2018 Declaration elaborates on the

inter/intra-agency nature of the records and their basis for being "predecisional."

6.       On pages 4-5 of the Motion, Khatchadourian asserts that DIA offered no

segregability analysis in its *Vaughn* index. Paragraph 63 of the 2018 Declaration provides the

appropriate attestation on segregability, specifically attesting to DIA's line-by-line review for

segregable and releasable information. Moreover, paragraph 31 of the 2018 Declaration

addresses two supplemental releases made by DIA to the plaintiff in August of 2018 that

included previously withheld information that DIA subsequently deemed releasable. These

supplemental releases reflects DIA's good faith in engaging in continual line-by-line analysis for

releasability and segregability.

7.       On page 5 of the Motion, Khatchadourian takes issues with DIA's failure to

provide in its *Vaughn* index the titles of several records. In some situations, DIA is unable to

disclose the title of a responsive record because it is protected under an appropriate FOIA

exemption. For example, in some cases, the title might be protected under Exemption 1 because

it contains properly classified information that identifies sources and methods. In other cases,

DIA may need to protect the title of a record under Exemption 3, 10 U.S.C. §424, because releasing the title would inappropriately disclose information about the specific function of the IRTF and the types of records it reviewed.  In all cases, however, DIA made every attempt to balance transparency and release of titles with its duty to protect sensitive or classified information.

8.      On pages 5-6 of the Motion, Khatchadourian accuses DIA of bad faith based on records reflecting the agency's internal deliberations and review process prior to finalizing releases made in response to his First FOIA Request.  The interagency communications referenced by plaintiff are not evidence of bad faith, but rather, they reflect DIA's standard review and quality-control process prior to making any releases in response to FOIA requests by the Agency.

9.      On pages 6-7 of the Motion, Khatchadourian accuses DIA of bad faith based on inconsistent application of redactions to an August 15, 2010 slide deck.  The application of exemptions is not an exact science and differences in application can occur.  In the case of the record Khatchadourian identified, it was reviewed by a subject matter expert in 2013, at the time of initial release.  Three years later, another subject matter expert reviewed it in conjunction with the continued processing of responsive records without noticing that it had been previously processed and released to the plaintiff three years earlier.  The subsequent review resulted in a different application of the FOIA exemptions.  Such inadvertent inconsistencies are an unavoidable consequence when dealing with a large number of records and multiple reviewers over an extended period.  As explained above, and in the 2018 declaration, DIA has made every effort, in good faith, to ensure accurate and consistent release of information to the plaintiff.

<u>**Motion for Summary Judgment**</u>

*<u>Raffi Khatchadourian, vs. DIA, et al.</u>, No. 16-0311 (D.D.C.)*
*Alesia Y. Williams Supplemental Declaration*

10.     DIA has searched all locations within its system of records that it has a reasonable basis to believe contain records responsive to Khatchadourian's FOIA requests.  This includes the IRTF electronic databases that served as repositories for all products generated by the IRTF, and the secure email systems of the six individuals identified as most significantly involved with the IRTF during its formation period.  DIA did not search locations that likely would have contained duplicative records already captured by its other searches.

11.     As I stated in paragraph 14 of the 2018 Declaration, after DIA concluded its production in late October 2016, Khatchadourian requested that it conduct a search of its email systems for potentially responsive records relating to the first and second prongs of his First FOIA Request.  This request was the result of discussions between DIA and plaintiff following Khatchadourian's November 14, 2016 letter addressing DIA's production to date.  As further discussed in paragraphs 15-22 of the 2018 Declaration, because of those discussions, DIA agreed to conduct certain test searches of emails on its secure systems.  This search covered the emails of all DIA members of the IRTF over a span of more than three years using broad search terms. Subsequently, DIA agreed to conduct a review for responsiveness of two samples of potentially responsive records from that email search.  At no point did DIA agree to process all of the potentially responsive records that any of the test searches identified.

12.     As explained in paragraph 25 of the 2018 Declaration, DIA pursued an alternative email search protocol that it believed was more reasonably likely to identify responsive records to the first prong of the First FOIA request.  In the Motion, Khatchadourian questions DIA's decision to limit the revised email search to records responsive to the first prong of his request. DIA scoped its revised email search to focus on the first prong of the First FOIA Request because the second prong specifically sought conclusions, reports or assessments generated by

the IRTF; it did not seek communications or records relating to the conclusions, reports or assessments. Accordingly, and based on its understanding of the purpose and content of the IRTF electronic databases, DIA determined that records responsive to the second prong of the First FOIA Request were more likely found in electronic databases and that an email search was not reasonably likely to result in responsive records beyond those identified in the searcj pf the databases. DIA relayed this understanding to Khatchadourian and the Court in the July 17, 2017 Joint Status Report (ECF 45).

13.     On pages 13-14 of the Motion, Khatchadourian asserts that DIA deliberately ignored "positive indications of overlooked" email records responsive to the second prong of his First FOIA Request. To support that, Plaintiff references morning and afternoon "Email briefs" that DIA's revised email search purportedly did not locate. DIA produced hundreds of these morning and afternoon "Email briefs". In other words, these records were captured in DIA's search of the IRTF electronic databases; no email search was required to capture and produce these records. Examples of how these records, similar to those attached as Exhibits 7-9 to the Townsend Declaration, appear in DIA's *Vaughn* index include:

- **V-35**: "Information Review Task Force Analytic Update", dated August 14, 2010 - 1600
- **V-135**: "IRTF Situation Update", dated September 2, 2010 – 0800
- **V-139**: "IRTF Situation Update", dated October 6, 2010 – 1600
- **V-171**: "IRTF 26 AUG 10 -1600", dated August 26, 2010
- **V-179**: "IRTF 3 JAN 11 – 0800", dated January 2, 2011
- **V-321**: "IRTF Situation Update 21 April 11 – 0800", dated April 11, 2011
- **V-437**: "IRTF Situation Update 1 MAR 11 – 0800", dated March 1, 2011

14.     The six secure system email repositories that DIA searched as part of its revised email search included the email repositories of Robert A. Carr, Scott Liard, and John Kirchhofer.

15.     On page 17 of the Motion, Khatchadourian references "100 information papers." While plaintiff correctly points out that one of the records identified in DIA's *Vaughn* index is an "information paper" (V-209), DIA is unaware of the existence of a large volume of records with this description. It is more likely that the "100 information papers" is a reference to the Information Memorandum format that the IRTF used to report developments in its review and assessment of the impact of the unauthorized disclosure of information resulting from the leaked documents. DIA's *Vaughn* index reflects production of well over 100 of these memoranda. Examples of how DIA identified these records in the *Vaughn* index include:

- **V-037**: "11-0285A", dated March 30, 2011, and described as "Memorandum"
- **V-132**: "Information Review Task Force (IRTF) November 22, 2010 Update", dated November 24, 2010, and described as "Memorandum"
- **V-588**: "Info Memo IRTF – Update 9 Aug 2010", August 9, 2010, and described as "Memorandum"

16.     On page 17 of the Motion, Khatchadourian refers to four records that DIA released in a different FOIA case as supposed proof of deficiencies in DIA's revised email search. The FOIA case referenced by plaintiff, *Leopold v. Department of Defense,* now dismissed, involved a much broader request than Khathchadourian's First FOIA Request. (*See* Exhibit 1) Specifically, the FOIA request in the *Leopold* case sought:

- All Interagency Review Task Force-1 (IRTF-1) report(s) assessing the "damage" by the leaks of former National Security Agency contractor Edward Snowden.

- Any and all communications between the DIA and individual members of Congress and Congressional Committees mentioning or referring to the IRTF-1 report.

- Any and all communications between DIA and the National Security Agency (NSA) mentioning or referring to the IRTF-1 report.

- Any and all communications between the DIA and the State Department mentioning or referring to the IRTF-1 report.

- Any and all draft and final talking points mentioning or referring to the IRTF-1 report.

- Any and all communications between DIA personnel assigned to the IRTF-1 team and DIA Director Michael Flynn, the DIA Office of General Counsel, the Office of the DIA Chief of Staff and the Assistant Secretary of Defense for Legislative Affairs (LA).

- The IRTF-1's budget.

- Any and all records referring to the establishment of the Information Review Task Force "that was directed to examine the harm to national security caused by Edward Snowden's unlawful disclosures."

- Any and all reports prepared by the Joint Staff Mitigation Oversight Task Force (MOTF).

- The MOTF's budget.

- Any and all communications between the MOTF and individual members of Congress and Congressional Committees mentioning or referring to this report.

- Any and all draft and final talking points mentioning or referring to the MOTF reports.

- Any and all records in the IRTF's isolated records system mentioning Edward Snowden, 1.7 million, 900,000, "person of interest," "traitor," and "former National Security Agency contractor."

- Any and all IRTF-2 reports.

- Any and all communications between the DIA IRTF Task Force and the Office of Director of National Intelligence and the Office of the National Counterintelligence Executive (ONCIX).

17.     The search protocol that DIA used to identify records responsive to the *Leopold* request, based on the scope of the request and negotiations with the plaintiff in that case, necessarily was different from the search used to identify responsive records to Khatachadourian's First FOIA Request and yielded different results. Notably, in response to Khatchadourian's First FOIA Request, DIA did locate and process the record identified as Exhibit 1 to the Light Declaration (ECF No. 78-6). This record is identified as V-315 in DIA's *Vaughn* index and was denied in full.

18.     Based on the understanding that the IRTF electronic databases identified in the 2018 Declaration were intended to be the repositories for all products generated by the IRTF, DIA reasonably determined that these electronic databases were the locations most likely to contain responsive records. DIA has no reasonable basis to believe that a search of the IRTF's Intellipedia page is reasonably likely to contain responsive records not already identified in DIA's search of the IRTF electronic databases. Similarly, DIA has no reasonable basis to believe that a search of the IRTF RFI portal referenced in Khatchadourian's briefing is reasonably likely to yield records responsive to either the first or the second prongs of Khatchadourian's First FOIA Request.

19.     Similarly, DIA has no reasonable basis to believe that a search of the files or offices of persons who acted as the IRTF's Congressional liaison is reasonably likely to yield records responsive to either prong of the Khatchadourian's First FOIA Request. For example, the document referenced in paragraph 75 of Khatchadourian's Statement of Material Fact and

Exhibit 15 to the Townsend Declaration indicates that the IRTF would receive RFIs from the Office of the Secretary of Defense's Public Affairs office for information to respond to media requests. This document speaks directly to an IRTF function/responsibility (i.e., responding to media requests) and is responsive to the second prong of Khatchadourian's First FOIA Request. However, there is no reason to assume that the RFIs themselves and the responses to them would be responsive because they do not speak to the creation, scope, structure or responsibilities of the IRTF, or to conclusions, reports, or assessments generated by the IRTF.

20.     As regards Khatchadourian's suggestion that DIA failed adequately to search Congressional liaison records based on references in released records to a "final fact sheet used for telephone notification of the Congressional Committees/Staff[,]" "Talking Points," and a "Q&A," such records are not responsive to Khatchadourian's First FOIA Request.   Such records do not, on their face, speak to the creation, scope, structure or responsibilities of the IRTF, nor are they conclusions, assessments or reports.  To the extent that any such records contain information responsive to the First FOIA Request, DIA identified them in its searches and processed them appropriately.  DIA's *Vaughn* index identifies 17 separate records described as "Talking Points" (**V-477, V-478, V-522, V-523, V-524, V-525, V-526, V-527, V-528, V-529, V-530, V-531, V-544, V-583, V-625, V-626,** and **V-627**).  Additionally, the record identified as V-533 in DIA's *Vaughn* index is titled "Additional Questions Regarding Wikileaks and IRTF" and is described as "Word questions and answers document."

21.     In footnote 7 of the Motion, Khatchadourian expresses some confusion about DIA's *Vaughn* index and subsequent amendments to the index.  I will attempt to clear up any confusion here.  On August 31, 2018, in conjunction with its Motion for Summary Judgment and the 2018 Declaration, DIA filed with the court its *Vaughn* index, reflecting entries V-001 through

V-844. Because of the length of the *Vaughn*, DIA prepared it in two parts – the first part covering V-001 through V-461 and the second part covering V-462 through V-844. This is reflected on the top of each page of the *Vaughn* index wherein it states either "Part 1" or "Part 2".

22.     On December 20, 2018, after becoming aware that it inadvertently omitted from its *Vaughn* index the six records DIA originally released to Khatchadourian in 2013, DIA submitted an Amended *Vaughn* index adding those six records as V-845 through V-850. Since "Part 1" of the original *Vaughn* index was unaffected by this filing, DIA only submitted an Amended "Part 2" of the *Vaughn* index.

23.     Lastly, on March 20, 2019, DIA submitted a second Amended *Vaughn* index to correct an administrative error that identified certain records as having been released in part when, in fact, DIA denied them in full. Once again, since this correction did not implicate "Part 1" of the *Vaughn* index, DIA only submitted an Amended "Part 2" of the *Vaughn* index.

24.     The August 31, 2018 *Vaughn* index – Part 1, in conjunction with the March 20, 2019 Amended *Vaughn* index – Part 2, represents the complete and current DIA *Vaughn* index.

25.     On pages 30-31 of the Motion, Khatchadourian accuses DIA of making three productions of a slidedeck dated November 29, 2010 and withholding more information with each subsequent release. These records are identified as Exhibits 37-39 to the Townsend Declaration. First, a simple comparison demonstrates that the document attached as Exhibit 39 is different from the documents attached as Exhibits 37 and 38. The document at Exhibit 39 is only 20 pages, counting pages that DIA withheld in full, while the other documents are 29 pages. Additionally, in the document attached as Exhibit 39, the slide titled "Media Analysis" begins at page 7 of the slidedeck, while in the documents attached as Exhibits 37 and 38, it begins at page

12 of the slide decks.  As regards documents 37 and 38, which are duplicates, the only explanation is human error.  The application of exemptions is not an exact science.  Inevitably, there is an element of subjectivity in applying how exemptions are applied and, consequently, different reviewers may process records with different results.  This case ultimately resulted in 850 responsive records.  As previously attested to, DIA has made every effort to ensure that records were processed consistently and in conformity with the FOIA and its exemptions.  This is reflected in DIA's pre-release quality check processes, and DIA's supplemental releases.

26.   On page 31, Khatchadourian asserts that DIA withheld portions of a record in this case that was produced in the *Leopold* case.  In response to this assertion, DIA has confirmed that it produced the identical document in this case and the *Leopold* case.  Page 11 of the document was inadvertently omitted from the version provided to Khatchadourian.  If DIA had intended on withholding the information on that missing page, the document provided to Khatchadourian would have noted that the page was withheld in full and not included, consistent with DIA protocol. *See* Exhibits 37-39 of the Townsend Declaration (ECF No. 78-4).  DIA will provide the missing page to Khatchadourian.

27.   DIA's 2018 Declaration does not account for DIA's December 2018 and March 2019 amendments to its *Vaughn* index.  This Declaration supplements my 2018 Declaration and addresses the *Vaughn* index amendments.

28.   As noted above, the August 31, 2018 *Vaughn* index (Part 1), in conjunction with the March 20, 2019 Amended *Vaughn* index (Part 2), represents the complete and current DIA *Vaughn* index.  The *Vaughn* index identifies all records that DIA withheld in full, withheld in part, or released in full as documents **V-1** through **V-850**.

29.     Regarding documents **V-844** through **V-850**, which DIA added to the *Vaughn* index after the 2018 Declaration, DIA attests to the following:

- DIA withheld certain information in documents **V-845** and **V-846** under Exemption 1 because it relates to military plans, weapons systems, or operations, and is thus properly classified under Section 1.4(a) of E.O. 13,526.  DIA incorporates paragraphs 37-40 of the 2018 Declaration explaining its basis for withholding information under Section 1.4(a).

- DIA withheld certain information in document **V-846** under Exemption 1 because information at issue is derived from a confidential intelligence liaison relationship with a foreign government, and the disclosure of the withheld information could reasonably be expected to cause either serious or exceptionally grave damage to national security, and is thus properly classified as either Secret or Top Secret under Section 1.4(b) of E.O. 13,526.   DIA incorporates paragraphs 41-45 of the 2018 Declaration explaining its basis for withholding information under Section 1.4(b).

- DIA withheld certain information in documents **V-845, V-846** and **V-850** under Exemption 1 because the information contained in the withheld portions relates to intelligence sources and methods, the disclosure of which could reasonably be expected to cause either serious damage or exceptionally grave damage to national security, and thus, is properly classified as Secret or Top Secret under Section 1.4(c) of E.O. 13,526.  DIA incorporates paragraphs 46-49 of the 2018 Declaration explaining its basis for withholding information under Section 1.4(c).

- DIA withheld certain information in document **V-846** under Exemption 1 because information at issue relates to foreign relations or foreign activities of the United States, and disclosure of the withheld information could reasonably be expected to cause either serious or exceptionally grave damage to national security, and is thus properly classified under Section 1.4(d) of E.O. 13,526.   DIA incorporates paragraphs 50-52 of the 2018 Declaration explaining its basis for withholding information under Section 1.4(d).

- DIA withheld certain information in documents **V-845, V-846, V-849** and **V-850** under Exemption 3, pursuant to 10 U.S.C. § 424 or 50 U.S.C. § 3024(i), as noted in the *Vaughn* index.  DIA incorporates paragraphs 56-59 of the 2018 Declaration explaining its basis for withholding information under these statutes.

- DIA withheld certain information in document **V-850** under Exemption 5 because the information is protected by the deliberative process privilege.  DIA incorporates paragraphs 60-61 of the 2018 Declaration explaining its basis for withholding information under this privilege.

- DIA withheld certain information in documents **V-846** and **V-850** under Exemption 6, which permits withholding of personnel information, the disclosure of which would constitute an unwarranted invasion of personal privacy.  DIA incorporates paragraph 62 of the 2018 Declaration explaining the basis for withholding information under this Exemption.

30.     No supplemental Declaration is necessary to demonstrate that records **V-709 through V-761** are properly withheld in full.  As noted in paragraph 23 above, the amendment to DIA *Vaughn* index associated with those records was only administrative.  DIA made no

changes to the exemptions applicable to those records and, therefore, the bases for withholding those records in full already are articulated in the 2018 Declaration.

31.     Regarding Plaintiff's assertions about DIA's invocation of Exemption 3 and 10 U.S.C. § 424's protections, DIA wishes to clarify that it has properly withheld information relating to sensitive functions of DIA that fall within the meaning of subsection (c)(1) of that provision.

32.     DIA unintentionally omitted from its 2018 Declaration an explanation of the withholding of information in records **V-235, V-266**, and **V-287** under Exemption 7 of the FOIA.   Specifically, the FBI requested that DIA withhold certain information in all three documents under exemption 7(A) and additional information in document **V-287** under exemption 7(C).   After further review, the FBI has indicated that the information previously protected under exemption 7(A) can be released.   DIA will reprocess the affected records accordingly.

33.     FBI continues to assert the protections of exemption 7(C) to the information withheld in document **V-287**.   FOIA Exemption 7 exempts from mandatory disclosure records or information compiled for law enforcement purposes when disclosure could reasonably be expected to cause one of the harms enumerated in the subparts of the exemption.   *See* 5. U.S.C. § 552(b)(7).   Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate the records or information at issue were compiled for law enforcement purposes.   Pursuant to 28 U.S.C. §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another

agency, to conduct investigations and activities to protect the United States and its people from

terrorism and threats to national security, and further the foreign intelligence objectives of the

United States. Here, the FBI is relying on Exemption 7 (in conjunction with Exemption 6) to

protect the identity of an FBI Special Agent ("SA") conducting law enforcement investigations

as detailed below.

34.     Law enforcement agencies such as the FBI must demonstrate that the records at

issue are related to the enforcement of federal laws and that the enforcement activity is within the

law enforcement duties. Here, the name of an FBI SA investigating criminal activities

concerning the unauthorized disclosure of classified information published on the WikiLeaks

website is protected from release. The FBI's Washington Field Office opened a

criminal/national security investigation into these allegations in 2010 and maintains them

pursuant to applicable Attorney General Guidelines. The investigation is within the law

enforcement duties of the FBI to detect and undertake investigations into possible violations of

Federal criminal laws and records and information during that investigation readily meet the

threshold for applying FOIA Exemption 7.

35.     Exemption 7(C), 5 U.S.C. § (b)(7)(C), exempts from disclosure "records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to constitute an

unwarranted invasion of privacy."

36.     In withholding information pursuant to both Exemption 6 and Exemption 7, the

FBI is required to balance the privacy interests of the individuals mentioned in these records

against any public interest in disclosure. For purposes of this analysis, a public interest exists

when information would shed light on the FBI's performance of its mission to protect and defend

the United States against terrorist and foreign intelligence threats; to uphold and enforce the criminal laws of the United States; and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.

37.     In this case, the FBI protected the name of an FBI SA who is responsible for conducting, supervising, and/or maintaining FBI investigative activities concerning the unauthorized disclosure of classified information published on the WikiLeaks website. This SA has responsibilities beyond this investigation, and disclosure of his/her name could lead to interruption of her/her official duties with respect to this and other national security investigations. Assignments of SAs to any particular investigation are not necessarily by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. FBI SAs, as individuals, also have privacy interests in being free from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. They come into contact with all strata of society, conducting searches and making arrest, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge that may last for years. These individuals may seek revenge on the agents and other federal employees involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent, and could lead to disruptive inquiries into a pending investigation. Accordingly, the FBI concluded that this SA has substantial privacy interests here. In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure

of this FBI SA's name, by itself, would not significantly increase the public's understanding of the operations and activities of the FBI.

38.    DIA is making a discretionary release of previously withheld names of the following IRTF members who held various leadership roles during the initial formation and operations of the IRTF:  Scott Liard, John Kirchhofer, and Robert A. Carr.  Wherever a redacted named appears in conjunction with a reference to the IRTF Chief, that name is Scott Liard. Wherever a redacted name appears in conjunction with a reference to the IRTF Deputy or IRTF Deputy Chief, that name is John Kirchhofer.  Wherever a redacted name appears in conjunction with a reference to the IRTF Director, that name is Robert A. Carr.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May, 2019

Alesia Y. Williams
Program Manager, DIA Declassification
Technology Project

# EXHIBIT 1

**FOIA**

FOIA

| | | |
|---|---|---|
| **From:** | Jason Leopold [jasonleopold@gmail.com] | |
| **Sent:** | Thursday, July 02, 2015 12:01 AM | RECEIVED JUL 02 2015 |
| **To:** | FOIA | |
| **Subject:** | Request for records under the Freedom of Information Act. This request seeks expedited processing | |

July 1, 2015

**Freedom of Information and Privacy Acts request:**

To: Defense Intelligence Agency
ATTN: DAN-1A (FOIA)
200 MacDill Blvd
Washington, DC 20340-5100

This is a request for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. This request should be considered under both statutes to maximize the release of records.

Further, please note that this request seeks expedited because there is a "compelling need" for the records, as that term is defined in DoD 5400.7-R C1.5.4.3.2.

## REQUESTER INFORMATION

**Name:** Jason Leopold

**Address:** 1669 Benedict Canyon Dr., Beverly Hills, CA 90210

**Email:** JasonLeopold@gmail.com

## RECORDS SOUGHT

I request disclosure of the following records that were prepared, received, transmitted, collected and/or maintained by the Defense Intelligence Agency (DIA):

1. All Interagency Review Task Force-1 (IRTF-1) report(s) assessing the "damage" by the leaks of former National Security Agency contractor Edward Snowden.

2. Any and all communications between the DIA and individual members of Congress and Congressional Committees mentioning or referring to the IRTF-1 report.

1

3. Any and all communications between DIA and the National Security Agency (NSA) mentioning or referring to the IRTF-1 report.

4. Any and all communications between the DIA and the State Department mentioning or referring to the IRTF-1 report.

5. Any and all draft and final talking points mentioning or referring to the IRTF-1 report.

6. Any and all communications between DIA personnel assigned to the IRTF-1 team and DIA Director Michael Flynn, the DIA Office of General Counsel, the Office of the DIA Chief of Staff and the Assistant Secretary of Defense for Legislative Affairs (LA).

7. The IRTF-1's budget.

8. Any and all records referring to the establishment of the Information Review Task Force "that was directed to examine the harm to national security caused by Edward Snowden's unlawful disclosures." [1

9. Any and all reports prepared by the Joint Staff Mitigation Oversight Task Force (MOTF).

10. The MOTF's budget.

11. Any and all communications between the MOTF and individual members of Congress and Congressional Committees mentioning or referring to this report.

12. Any and all draft and final talking points mentioning or referring to the MOTF reports.

13. Any and all records in the IRTF's isolated records system mentioning Edward Snowden, 1.7 million, 900,000, "person of interest," "traitor," and "former National Security Agency contractor."

14. Any and all IRTF-2 reports.

15. Any and all communications between the DIA IRTF Task Force and the Office of Director of National Intelligence and the Office of the National Counterintelligence Executive (ONCIX)

## REQUEST FOR EXPEDITED PROCESSING

Under DoD 5400.7-R C1.5.4.3.2, a "compelling need" is defined as "urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." The term "urgently needed" is further defined by C1.5.4.3.2.1 to mean that "the information has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest."

I am seeking expedited treatment for this request.

1. *The records are urgently needed.*

The requested records involve a breaking news story of general public interest. Countless publications have shown an interest in the report and the role of the American government and intelligence community in attempting to refute the idea that Edward Snowden is a heroic whistleblower. Reports on the subject have appeared in a wide variety of news outlets including The Washington Post, The New York Times, The Guardian, NBC News, and many other major publications.

As demonstrated by the articles referenced in the previous section, there has been widespread questioning of the federal government's activities. Because of the American government and intelligence community's roles in attempting to show the harm caused by Snowden, and accusations by critics that the selective leak of portions of the report distorts the true facts, the records requested are of general public interest.

*2. I am primarily engaged in disseminating information to inform the public about the federal government's activities.*

I am a full-time member of the news media. I am the senior investigative reporter for VICE News [https://news.vice.com/contributor/jason-leopold/page/1]. My journalism has been published in dozens of domestic and international publications, I am a person primarily engaged in disseminating information. The focus of most of my reporting is national security, counterterrorism, civil liberties, human rights and open government.

*3. Certification*

I certify pursuant to DoD 5400.7-R C1.5.4.3.3 that the foregoing is true and correct to the best of my knowledge, and that a compelling need exists for the requested records.

JASON LEOPOLD verified signatutr

_____

Jason Leopold

## INSTRUCTIONS REGARDING SEARCH

*1. Instructions Regarding "Leads":*

As required by the relevant case law, the DIA should follow any leads it discovers during the conduct of its searches and perform additional searches when said leads indicate that records may be located in another system. Failure to follow clear leads is a violation of FOIA.

*2. Request for Public Records:*

Please search for any records even if they are already publicly available.


*3. Request for Electronic and Paper/Manual Searches:*

I request that searches of all electronic and paper/manual indices, filing systems, and locations for any and all records relating or referring to the subject of my request be conducted.

I request that the DIA search the following databases of which I am aware: all electronic databases dating back to 1987, the database to hardcopy files dating from 1965 to 1987, the database of finished intelligence products from 1965 to the present. The DIA should also search outside of these databases for electronic records prior to 1987, database to hardcopy files for years other than between 1965 and 1987, and finished intelligence products prior to 1965.


*4. Request for Additional Filing Systems, Indices, and Locations Searches:*

I request that the DIA search for responsive records in its research and reference resource library, as well as other offices which may hold responsive records, including but not limited to, the offices of Security (DAC), Inspector General (IG), Human Resources (HC), Joint Military Intelligence College (MC), and Directorate of Operations (DO). I further request that the DIA's search include, but not be limited to, the following systems of records: LDIA 0271, Investigations and Complaints; LDIA 0275, DoD Hotline Referrals; LDIA 0660, Security Files; LDIA 0800, Operation Record System.

Additionally, please search *all* of your indices, filing systems, and locations, including those I have not specified by name and those of which I may not be aware.


*5. Request regarding Photographs and other Visual Materials:*

I request that any photographs or other visual materials responsive to my request be released to me in their original or comparable forms, quality, and resolution. For example, if a photograph was taken digitally, or if the DIA maintains a photograph digitally, I request disclosure of the original digital image file, not a reduced resolution version of that image file nor a printout and scan of that image file. Likewise, if a photograph was originally taken as a color photograph, I request disclosure of that photograph as a color image, not a black and white image. Please contact me for any clarification on this point.


*6. Request for Duplicate Pages:*

I request disclosure of any and all supposedly "duplicate" pages. Scholars analyze records not only for the information available on any given page, but also for the relationships between that information and information on pages surrounding it. As such, though certain pages may have been previously released to me, the existence of those pages within new context renders them functionally new pages. As such, the

4

only way to properly analyze released information is to analyze that information within its proper context. Therefore, I request disclosure of all "duplicate" pages.

### 7. Instructions Regarding "Hits":

When a search registers a "hit," the DIA should consider any corresponding hardcopy document to be responsive to my request. In addition, the DIA should order all corresponding hardcopy documents which are no longer actively used from The Washington National Records Center and consider those documents to be responsive to my request.

### 8. Request to Search Emails:

Please search for emails relating to the subject matter of my request.

### 9. Regarding Destroyed Records:

If any records responsive or potentially responsive to my request have been destroyed, my request include, but is not limited to, any and all records relating or referring to the destruction of those records. This includes, but is not limited to, any and all records relating or referring to the events leading to the destruction of those records.

### 10. Request for Search of Records Transferred to Other Agencies:

I request that in conducting its search, the DIA disclose releasable records even if they are available publicly through other sources outside the DIA, such as NARA.

## INSTRUCTIONS REGARDING SCOPE AND BREADTH OF REQUESTS

Please interpret the scope of this request broadly. The DIA is instructed to interpret the scope of this request in the most liberal manner possible short of an interpretation that would lead to a conclusion that the request does not reasonably describe the records sought.

## EXEMPTIONS AND SEGREGABILITY

I call your attention to President Obama's 21 January 2009 Memorandum concerning the Freedom of Information Act, in which he states:

> All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA [....] The presumption of disclosure should be applied to all decisions involving FOIA.[2]

In the same Memorandum, President Obama added that government information should not be kept confidential "merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."

Finally, President Obama ordered that "The Freedom of Information Act should be administered with a clear presumption: In the case of doubt, openness prevails."

Nonetheless, if any responsive record or portion thereof is claimed to be exempt from production, FOIA/PA statutes provide that even if some of the requested material is properly exempt from mandatory disclosure, all segregable portions must be released. If documents are denied in part or in whole, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Please provide a complete itemized inventory and a detailed factual justification of total or partial denial of documents. Specify the number of pages in each document and the total number of pages pertaining to this request. For "classified" material denied, please include the following information: the classification (confidential, secret or top secret); identity of the classifier; date or event for automatic declassification or classification review or downgrading; if applicable, identity of official authorizing extension of automatic declassification or review past six years; and, if applicable, the reason for extended classification beyond six years.

In excising material, please "black out" the material rather than "white out" or "cut out." I expect, as provided by FOIA, that the remaining non-exempt portions of documents will be released.

Please release all pages regardless of the extent of excising, even if all that remains are the stationery headings or administrative markings.

In addition, I ask that your agency exercise its discretion to release records which may be technically exempt, but where withholding serves no important public interest.


## ADDITIONAL INSTRUCTIONS REGARDING REQUEST

Please produce all records with administrative markings and pagination included.

Please send a memo (copy to me) to the appropriate units in your office to assure that no records related to this request are destroyed. Please advise of any destruction of records and include the date of and authority for such destruction.


## FORMAT

I request that any releases stemming from this request be provided to me in digital format (soft-copy) on a compact disk or other like media.

## FEE CATEGORY AND REQUEST FOR A FEE WAIVER

I am willing to pay any reasonable expenses associated with this request, however, as the purpose of the requested disclosure is in full conformity with the statutory requirements for a waiver of fees, I formally request such a waiver. I request a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge ... if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. See *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters."). I incorporate by reference the explanation and attached materials in the above sections which demonstrate why the requested information is in the public interest as well as my ability to analyze and disseminate the information received.

DoD 5400.7-R C6.1.4.1 provides that "documents shall be furnished without charge, or at a charge reduced below fees assessed to the categories of requesters in subsection C6.1.5., below, when the Component determines that waiver or reduction of the fees is in the public interest because furnishing the information is likely to contribute significantly to public understanding of the operations or activities of the Department of Defense and is not primarily in the commercial interest of the requester."

Should my request for a fee waiver be denied, I request that I be categorized as a member of the news media for fee purposes pursuant to DoD 5400.7-R C6.1.5.7. According to 5 U.S.C. § 552(a)(4)(A)(ii), which codified the ruling of *Nat'l Security Archive v. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. This is consistent with the definition provided in DoD 5400.7-R C6.1.5.7.1.

As the legislative history of FOIA reveals, "It is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected. ... In fact, any person or organization which regularly publishes or disseminates information to the public ... should qualify for waivers as a 'representative of the news media.'" 132 Cong. Rec. S14298 (daily ed. Sept. 30, 1986) (emphasis in original quotation); and 2) "A request by a reporter or other person affiliated with a newspaper, magazine, television or radio station, or other entity that is in the business of publishing or otherwise disseminating information to the public qualifies under this provision." 132 Cong. Rec. H9463 (Oct. 8, 1986) (emphasis in original quotation)). Therefore, in accordance with the Freedom of Information Act and relevant case law, I, Jason Leopold, should be considered a representative of the news media.

There is a two-part test for determining whether a requestor is entitled to a waiver of fees. Records responsive to a request are to be furnished without charge if the requestor has demonstrated that "(i) Disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and (ii) Disclosure

of the information is not primarily in the commercial interest of the requestor." 28 CFR 16.11(k). The DOJ regulations further require the consideration of the following factors in determining whether the requestor has met the first part of the test: the subject of the request; the informative value of the information to be disclosed; the contribution to an understanding of the subject by the public likely to result from disclosure; and the significance of the contribution to public understanding. 28 CFR 16.11(k)(2). To determine whether the second part of the test is met, the DOJ regulations require consideration of the following factors: the existence and magnitude of a commercial interest; and the primary interest in disclosure. As explained below, my request clearly meets this two-part test, and is also the type of request, and I am the type of requestor, for which courts have held that waiver of fees is required under FOIA.

1. DISCLOSURE OF THE REQUESTED RECORDS IS IN THE PUBLIC INTEREST BECAUSE IT IS LIKELY TO CONTRIBUTE SIGNIFICANTLY TO THE PUBLIC UNDERSTANDING OF THE OPERATIONS AND ACTIVITIES OF THE GOVERNMENT.

A. The subject of the requested records concerns the operations and activities of the DIA and broader government. The subject of the requested records concerns identifiable operations and activities of the DIA and broader government, such as: governmental attempts to change the public narrative about Edward Snowden; selective leaks of a secret report; the government's response to the alleged harms caused by Edward Snowden; and the effect of Edward Snowden's actions on the government's intelligence-gathering capabilities.

B. The disclosure is likely to contribute to an understanding of government operations and activities because the disclosable portions of the requested records will be meaningfully informative about those operations and activities. The vast majority of disclosable information is not already in the public domain, in either a duplicative or a substantially identical form, and therefore the disclosure would add substantial new information to the public's understanding of issues including but not limited to: the use of selective leaks coordinated between lawmakers and the White House; specific examples of harm or the lack thereof alleged caused by Edward Snowden's actions; the government's public and nonpublic response to the actions of Edward Snowden; and the effect of Edward Snowden's actions on the government's intelligence-gathering capabilities.

The records I need to conduct my study are in the possession of the DIA and not in the public domain, except for the small portions of the report officially leaked.

C. The disclosure of the requested records will contribute to the increased understanding of a broad audience of persons interested in the subject, rather than merely my own individual understanding. Further, I will be collaborating with professionals who have great expertise in the subject area, and I have the ability and intention to effectively convey information to the public.

As explained herein in more detail, the audience likely to be interested in the subject is broad, and includes, historians of modern American government, politics, culture, and national security; journalists

reporting on American politics, government, national security, and society; civil liberties attorneys; and the general public.

i) I firmly intend to analyze the requested records in order to facilitate significant expansion of public understanding of government operations. I am well qualified to perform this analysis.

I am the senior investigative report at VICE News. I cover a wide-range of issues, including Guantanamo, national security, counterterrorism, civil liberties, human rights, and open government. My reporting has been published in the The Guardian, The Wall Street Journal, The Financial Times, Salon, CBS Marketwatch, The Los Angeles Times, The Nation, Truthout, Al Jazeera English and Al Jazeera America.

*As should be clear from the above, I have the ability and firm intention to disseminate to the public significant expansions of understanding of government operations based on my analysis of the requested disclosures.*

iii) Additional Note on Journalistic Research and the Public Interest:

Although I have herein provided extensive information supporting objectively reasonable arguments for the public interest of my request beyond that of journalistic inquiry alone, case law on this matter is emphatically clear that journalistic inquiry alone satisfies the FOIPA public interest requirement. *National Treasury Employees Union v. Griffin*, 811 F.2d, 644, 649 (D.C. Cir. 1987).

Further, as articulated in the amendments to FOIA established by the OPEN Government Act of 2007, I solidly meet the applicable definition of "a representative of the news media[.]" The OPEN Government Act of 2007 established that for FOIA purposes,

> 'a representative of the news media' means any person or entity that gathers information of potential interest to the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. 552(a)(4)(A)(ii)

Based on my completed and firmly intended research, analysis, and information dissemination activities detailed at length herein, I clearly satisfy this description.

Further, the OPEN Government Act of 2007's definition of "a representative of the news media" is taken nearly verbatim from language used by the United States Court of Appeals, District of Columbia Circuit in the court's 1989 FOIA fee waiver-oriented ruling in *National Security Archive v. Department of Defense.*[3] As the court also relatedly found in *National Security Archive v. Department of Defense*, a requester need not already have published numerous works in order to qualify as a representative of the news media. The court found that the express "intention" to publish or disseminate analysis of requested documents amply satisfies the above noted requirement for journalists to "publish or disseminat[e] information to the public." *National Security Archive v. Department of Defense*, 880 F.2d 1386, (D.C. Cir, 1989). As noted above, I am currently working on popular articles involving significant analysis of records obtained through FOIPA requests to be written by me and fellow journalist Jason Leopold. Additionally, as detailed above, I have already publicly disseminated significant analysis of documents obtained through FOIPA requests. I have expressed a firm intention to continue disseminating significant analysis of documents

obtained through FOIPA requests. And I have demonstrated my ability to continue disseminating significant analysis of documents obtained through FOIPA requests.

Therefore, in that I am "person or entity that gathers information of potential interest to the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience, I solidly meet the applicable definition of "a representative of the news media." As such, I have again more than satisfied the requirement for a fee waiver.[4]

D. The disclosure of the requested records is likely to contribute "significantly" to public understanding of government operations and activities because disclosure would enhance to a significant extent the public's understanding of the subject in question as compared to the level of public understanding existing prior to the disclosure

i) See above Section I.

ii) As noted above, the overwhelming preponderance of records I need to conduct my study are in the possession of the DIA and not in the public domain.

## II.  DISCLOSURE OF THE INFORMATION IS NOT PRIMARILY IN MY COMMERCIAL INTEREST.

A.  Any commercial interest that I have which would be furthered by the requested disclosure is *de minimis.*

I am requesting the release of records to analyze for use in the dissemination of news articles.  Though journalists do get paid for writing news articles, payment is not the primary purpose for which such work is conducted.  As the D.C. Circuit explained in *National Treasury Employees Union v. Griffin*, 811 F.2d, 644, 649 (D.C. Cir. 1987), "While private interests clearly drive journalists (and journals) in their search for news, they advance those interests almost exclusively by dissemination of news, so that the public benefit from news distribution necessarily rises with any private benefit. Thus it is reasonable to presume that furnishing journalists with information will primarily benefit the general public[.]"

The disclosure of records will significantly benefit the public interest, and this benefit to the public is of vastly greater magnitude than my minimal commercial interest.

B.  My primary interest in the requested information is not commercial, and the public interest is greater in magnitude than my commercial interest.

In *National Treasury Employees Union v. Griffin*, the court noted that the legislative history of the fee waiver provisions indicate "special solicitude for journalists and scholars."

> The legislative history of the fee waiver provision indicates special solicitude for journalists, along with scholars and public interest groups. While private interests clearly drive journalists (and journals) in their search for news, they advance those interests almost exclusively by dissemination of news, so that the public benefit from news distribution necessarily rises with any private benefit. Thus it is reasonable to presume that furnishing journalists with information

will primarily benefit the general public[.] *National Treasury Employees Union v. Griffin*, 811 F.2d, 644, 649 (D.C. Cir. 1987).

Similarly, in *Ettlinger v. FBI*, a case involving a university professor seeking the release of FBI documents pertaining to investigations of members of a dissident political group, the court noted, "Though it is true that the plaintiff has some personal interest in the records sought, there is no indication whatsoever, nor do the defendants claim, that the plaintiff seeks those records solely with the intention of achieving commercial or private benefit." *Ettlinger v. FBI*, 596 F. Supp. 867, 880 (D. Mass. 1984).

*My request for the release of records is in essential ways identical to the situations in the case law above. I seek records on the operations and activities of government for the purpose of publishing articles and analysis, as well as the dissemination of the records and my analysis of the records. The disclosure of records will significantly benefit the public interest, and this benefit to the public is of vastly greater magnitude than my minimal commercial interest.*

iii) Additionally, the courts and the legislature have been deeply invested in ensuring that FOIPA duplication and search fees are not used by government agencies to deliberately or otherwise thwart legitimate scholarly and journalistic research:

This was made clear in *Better Government Ass'n v. Department of State,* in which the court ruled that, "The legislative history of the fee waiver provision reveals that it was added to FOIA 'in an attempt to prevent government agencies from using high fees to discourage certain types of requesters, and requests,' in particular those from journalists, scholars and nonprofit public interest groups." *Better Government Ass'n v. Department of State*, 780 F.2d 86, 89 (D.C. Cir. 1986).

This point is further elaborated in *Ettlinger v. FBI,*

The legislative history of the FOIA clearly indicates that Congress intended that the public interest standard for fee waivers embodied in 5 U.S.C. § 552(a)(4)(A) be liberally construed. In 1974, Congress added the fee waiver provision as an amendment to the FOIA in an attempt to prevent government agencies from using high fees to discourage certain types of requesters and requests. The 1974 Senate Report and the sources relied on in it make it clear that the public interest/benefit test was consistently associated with requests from journalists, scholars and non-profit public interest groups. There was a clear message from Congress that "this public-interest standard should be liberally construed by the agencies." The 1974 Conference Report, in which differences between the House and Senate amendments were ironed out, retained the Senate-originated public-interest fee waiver standard and further stated "the conferees intend that fees should not be used for the purpose of discouraging requests for information or as obstacles to disclosure of requested information." Further evidence of congressional intent regarding the granting of fee waivers comes from a 1980 Senate Subcommittee report. The

report stated that "excessive fee charges . . . and refusal to waive fees in the public interest remain . . . 'toll gates' on the public access road to information." The report noted that "most agencies have also been too restrictive with regard to granting fee waivers for the indigent, news media, scholars . . ." and recommended that the Department of Justice develop guidelines to deal with these fee waiver problems. The report concluded: The guidelines should recommend that each agency authorize as part of its FOIA regulations fee waivers for the indigent, the news media, researchers, scholars, and non-profit public interest groups. The guidelines should note that the presumption should be that requesters in these categories are entitled to fee waivers, especially if the requesters will publish the information or otherwise make it available to the general public.

The court, in its *Ettlinger v. FBI* decision, continued that on 18 December 1980, a

policy statement was sent to the heads of all federal departments and agencies accompanied by a cover memorandum from then United States Attorney General Civiletti which stated that he had "concluded that the Federal Government often fails to grant fee waivers under the Freedom of Information Act when requesters have demonstrated that sufficient public interest exists to support such waivers." The Attorney General went on to state: Examples of requesters who should ordinarily receive consideration of partial fee waivers, at minimum, would be representatives of the news media or public interest organizations, and historical researchers. *Such waivers should extend to both search and copying fees, and in appropriate cases, complete rather than partial waivers should be granted.*

## III. CONCLUSION.

As demonstrated above, the disclosure of the requested records will significantly contribute to expanded public understanding of government operations. I have the intent and ability to disseminate this significant expansion of public understanding of government operations. The public interest in this significant expansion of public understanding of government operations far outweighs any commercial interest of my own in the requested release. Accordingly, my fee waiver request amply satisfies the rules of DoD 5400.7-R C6.1.4.1. Legislative history and judicial authority emphatically support this determination. For these reasons, and based upon their extensive elaboration above, I request a full waiver of fees be granted. I will appeal any denial of my request for a waiver of fees, and I will take the issue to the courts if necessary.

\*\*\*

Please do not hesitate to contact me if you have any questions concerning this request.

Thank you. I appreciate your time and attention to this matter.


Jason Leopold


[1] Supplemental declaration of Alesia Y. Williams in Jason Leopold v. Department of Defense May 22, 2015

[2] President Barack Obama, "Memorandum for the Heads of Executive Departments and Agencies, Subject: Freedom of Information Act," 21 January 2009;
<http://www.whitehouse.gov/the_press_office/FreedomofInformationAct/.>

[3] The language in *National Security Archive v. Department of Defense* reads, "A representative of the news media is in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir, 1989).

[4] Though the courts have subsequently narrowed the applicability of the National Security Archive v. Department of Defense ruling in terms of requirements to qualify as a representative of the news media (most notably in Judicial Watch, Inc. v. United States Department Of Justice), I still solidly satisfy even this narrowed understanding of "representative of the news media." In contrast to Judicial Watch, I have clearly demonstrated a firm intention to disseminate to the public my analysis of requested information. I have identified articles, an exhibit, and a book within which I firmly intend to, and in some cases already have, disseminated my analysis of requested information I have identified other news media representative whom I have already fruitfully provided my analysis of requested information, and with whom I firmly intend to continue collaborating on future disseminations of requested information. Ultimately, in contrast to Judicial Watch, which the court found to "merely make available [] the requested information," I have established "a firm intention to disseminate" my analysis of the requested information. See Judicial Watch, Inc. v. United States Department of Justice, 185 F.Supp. 2d 54, 59 (D.D.C. 2002).


--
**JASON LEOPOLD**
Investigative Reporter

**VICE News**
589 Venice Blvd.
Venice, CA 90291
p: 213.270.4334
e: jason.leopold@vice.com
t: @JasonLeopold
PGP

Muck Rack
Articles
Books
Latest investigative series: The Abu Zubaydah Diaries
Subscribe to me on Beacon

# EXHIBIT 2

**From:** Thurston, Robin F. (CIV) <Robin.F.Thurston@usdoj.gov>
**Sent:** Monday, June 19, 2017 3:54 PM
**To:**
**Subject:** [Non-DoD Source] FW: Khatchadourian v. DIA

Thanks,

Robin

From: Thurston, Robin F. (CIV)
Sent: Monday, June 19, 2017 3:53 PM
To: Katie Townsend <ktownsend@rcfp.org>; 'Adam A. Marshall' <amarshall@rcfp.org>
Subject: Khatchadourian v. DIA

Hi Katie and Adam,

This is in response to Plaintiff's request for DIA to provide an explanation of why non-responsive records in the second sample of emails reviewed were identified as such. While this request is outside the normal scope of information exchanged in FOIA-related proceedings, DIA has agreed to accommodate Plaintiff's request in the interest of allaying concerns about its processing of these records and moving this matter towards final resolution.

As you know, federal agencies are under no obligation to log or retain records they determine are not responsive to a specific FOIA request. Following this established protocol, DIA does not maintain a log of records it reviews and deems non-responsive to a request. Accordingly, exact duplication of the original sample reviewed is not possible. In response to Plaintiff's request, DIA has, in good faith, worked to identify the non-responsive records reviewed in the original sample as closely as possible. The sample generated very closely aligns with the results reported to Plaintiff after review of the original sample and DIA is confident that the reasoning behind determinations of non-responsiveness applies equally to both samples.

Non-responsive Emails

1

The sample email records that DIA identified as non-responsive do not relate to Plaintiff's request for documents relevant to the creation, scope, structure, and responsibilities of the IRTF, nor do they contain any conclusions, reports, or assessments generated by the IRTF. A majority of these emails are non-substantive forwards of attachments, some of which are responsive to Plaintiff's request and some of which are not. These emails ask for review of/comments to/input on/descriptions of/forwarding of/requests to print attached documents. Other emails contain no text; only attachments, some of which are responsive to Plaintiff's request and some of which are not. The remaining emails relate primarily to the following topics: meetings (the subject of which was not responsive to the request) -- these emails are meetings invitations, notices, confirmations, and meeting notes; personnel issues (e.g., rosters, appraisals and evaluations, mandatory training requirements, work schedules, contractor issues); administrative details regarding internal management (e.g., internal

deadlines, taskers and tasking tracking/progress, team priorities, classification and releasability issues, product templates, IT issues); miscellaneous letters requiring signatures; press articles and reporting; responses to public affairs questions; logistical collaboration and coordination with other government agencies; information related to databases, search tools, and related statistics; and miscellaneous topics related to WikiLeaks in general, but unrelated to the IRTF or the scope of Plaintiff's request.

Non-responsive Attachments

The sample attachments that DIA identified as non-responsive do not relate to Plaintiff's request for documents relevant to the creation, scope, structure, and responsibilities of the IRTF, nor do they contain any conclusions, reports, or assessments generated by the IRTF. A majority of these attachments are documents on topics related to WikiLeaks in general, but unrelated to the IRTF or the scope of Plaintiff's request (e.g., media issues, country reports, insider threat and counterintelligence issues, miscellaneous notifications, WikiLeaks inventory lists, Base Realignment And Closure (BRAC), unrelated intelligence reporting, statistics). The remaining attachments relate primarily to personnel matters (e.g., awards,

time and attendance, human capital concerns, thank you letters, rosters, senior officer profiles, in-processing forms); meeting agendas and read-aheads; cost/budget estimates and guidance; specific WikiLeaks documents; responses to media inquiries; administrative matters (e.g., task lists/logs and priorities, briefing topics and timelines, travel logistics); other government agency operations documents; activities reports for management; database search results; IT issues; product templates; other

government agency collaboration and coordination issues; and press reports.

Regards,

Robin

Robin Thurston

Trial Attorney, Federal Programs Branch

2

# EXHIBIT 3

████████████████████

| | |
|---|---|
| **From:** | Thurston, Robin F. (CIV) <Robin.F.Thurston@usdoj.gov> |
| **Sent:** | Wednesday, July 05, 2017 3:40 PM |
| **To:** | ██████████████ |
| **Subject:** | [Non-DoD Source] FW: Khatchadourian v. DIA |

From: Thurston, Robin F. (CIV)
Sent: Wednesday, July 05, 2017 3:39 PM
To: Katie Townsend <ktownsend@rcfp.org>; 'Adam A. Marshall' <amarshall@rcfp.org>
Subject: Khatchadourian v. DIA

Dear Katie and Adam:

This email provides information regarding DIA's identification of responsive records as it relates to the search of emails and attached electronic documents. DIA has agreed to provide this information in the interest of moving this matter towards final resolution without unnecessary drain of resources. Responsive records may, of course, still be withheld from release pursuant to appropriate FOIA exemptions.

1. Records relevant to the creation, scope, structure, and responsibilities of the Information Review Task Force (IRTF) include:

. Records containing information about the scope, performance, summary of deliverables, concept of operations, mission statements, mission requirements, and leadership chain of command;

. Records containing IRTF organization charts and breakdown of responsibilities;

. Records identifying essential resources and tools required to operate the IRTF during its lifecycle, to include identification of

supplementary resources in the event of unanticipated surges in effort;

. Records describing the processes and policies to be followed by IRTF personnel;

. Records detailing task force deliverables and mission objectives and actions necessary to complete those objectives;

. Records describing information, events, or issues that could impact the scope/focus of the IRTF's review and analysis;

,       Records describing how the IRTF will be structured to meet defined goals;

.       Records identifying personnel attributes necessary to conduct the various tasks to support the task force mission;

,       Records identifying task force members and participants;

.       Records identifying the individual responsibilities of IRTF members; and

.       Records relating to specific IRTF responsibilities arising as a result of the WikiLeaks disclosures, such as protection of specific

individuals and entities, protection of sources and methods, protection of information to limit unauthorized disclosures, identification of information with force protection significance, and education of the public.


2.      Conclusions, reports, or assessments that have been generated by the IRTF: Records generated as a result of the IRTF's analytical efforts. These may be documented in a variety of formats, such as Secretary of Defense memoranda, Public Affairs memoranda, country assessment reports, congressional briefings, threat assessments, leadership updates, E-mail, briefing notes, daily briefings, talking points, and desk notes.


I will be in touch shortly about our proposal for the email search.


Regards,

Robin